[Civ. No. 15470.   First Dist., Div. One.   July 1, 1953.]

ARTHUR MARINO, a Minor, etc., et al., Appellants, v. SAM VALENTI et al., Respondents.

DeMarco & DeMattei and T. G. Fitzgerald for Appellants.

J. E. Longinotti and Rankin, Oneal, Luckhardt, Center & Hall for Respondents.

WOOD (Fred B.), J.—This is an appeal by the plaintiffs from a minute order granting a nonsuit and from a formal judgment of dismissal entered thereon, in an action by Arthur Marino, Nellie Marino and Rudolph Zuniga, minors, for personal injuries sustained by them, and by Juan Marino for the death of his minor son George Marino, caused by the

explosion of dynamite caps with which the children were playing. George Marino had found the caps in a building on the premises of the defendants.

In support of their appeal the plaintiffs claim (1) that Nellie Marino and Juan Marino are prima facie entitled to recover under the attractive nuisance doctrine, (2) that the nontrespassing children, Arthur Marino and Rudolph Zuniga present prima facie cases against the defendant landowners on general principles of negligence, and (3) that the defendants were negligent *per se,* and hence prima facie liable to all of the plaintiffs by reason of their storage of these dynamite caps in asserted violation of certain requirements of the Health and Safety Code.

### The Facts

It happened about 4 o'clock in the afternoon of the 15th of November, 1946. The children were on their way home from school. They got off the school bus at the southwest corner of King and Tully Roads in Santa Clara County. King Road runs north and south; Tully, east and west. They walked across Tully and proceeded northerly along the west side of King. George and Nellie Marino left the group and entered a building which stood near the intersection in an orchard owned by the defendants. After entering the building George found two small boxes which contained the dynamite caps. He and Nellie then rejoined the group. On the way George discarded one of the boxes but kept the other and showed it to the children. While they were viewing it, the caps exploded. George was killed and the others were rendered permanently blind.

George was 11 years old and in the fourth grade in school; Nellie was 12, in the fifth grade; Arthur was 13, in the sixth grade; Rudy was 11, in the fourth grade. Each could read and write the English language.

The building was an old three-room wooden structure, 12 by 38 feet in size. Its outside walls consisted of 1 by 12 inch boards, with battens, laid vertically. Witnesses and counsel frequently referred to it as a "shack." It lay parallel to King Road, about 15 feet west of the west shoulder of the pavement; set in about 60 feet from Tully Road. There was no fence or other barrier between it and either road. A tree and a telephone pole (of a line of trees and poles) stood between it and King Road. It had an outside door, which

was padlocked, and a window that was boarded up, on the west or orchard side; and a window on the east side, facing King Road; on its front, facing Tully Road, there were several large posters; among them, posters advertising a circus and the county fair.

*Nellie Marino testified*: The shack was real close to the road, pretty close; closer to King than to Tully Road. There was a house about a block and a half away from it, in one direction, and another about the same distance in another direction. I had passed by the shack before as I went to school. Before this day, I had gone on the orchard side of it just once; the other children had done so also; we had circled around it to get to the bus.

There were posters on the side of the shack which faced Tully Road, 3 or 4 by 5 feet in size, about four of them. They were about a race track and things like the circus. There was a window on the orchard side of it, all boarded up. I don't think you could see in from that window. I don't recall seeing any other window. I don't remember any door leading to the outside; I think I just remember seeing a padlock.

That day after getting off the bus and crossing a road [Tully Road] we walked along King Road. We walked in a group past the shack. Then George left the group and I followed him. He went in back of the shack, to the rear part of it [the north end], sort of in the middle of that end. He sort of walked fast to it. When he got there he saw this board and kind of lifted it up and told me to hold it. While I was holding it he went in. It was a long up and down board about 14 inches wide. It reached from the bottom of the shack up to the top; loose on the bottom where the nails used to be. The bottom was loose, the nails were sticking out. The board was not broken. It was sticking out a quarter of an inch at the bottom. George grabbed it from the bottom. We pulled the bottom part away from the building; did not have to pull it all off the wall to get in; the top of it was still fastened to the building. We looked in just before we went in. We pulled the bottom part out about as much as the board was wide. Neither of us kicked or broke any board. It was not necessary for George to struggle with the board. He did not use any tools in moving it. I do not think the wood was broken. It was around half a minute from the time George first touched the board until there was a hole wide enough for him to enter. While I was holding it

he went in. Then I followed him. When we came out, the rear of the shack looked the same except the board was sort of to the side; I think it was pushed to the outside.

I saw nothing on the rear of the shack, when I was with the group [walking past that day], that George might have been attracted to. This was not the first time I went by the shack. On other occasions when we have passed by the shack George had not run to it. The only reason I went over to the shack was because George went over and I followed him.

After we went into the shack I noticed newspapers all over the floor. Not in piles, they were lying all crumpled up. There was dust all over the floor, and there were spider webs. It did not look like somebody was living there. There was no order at all about anything in there.

There were three rooms. It was a long shack with two partitions dividing it into three rooms. There were no doors in the partitions; just door openings without doors. There was nothing at all in the first room except some crumpled newspapers. I went into the second room. I observed the same thing about the condition of that room, except there was a table against the rear partition near the right rear corner; that's all there was different from the first room. Yes, there were newspapers there, crumpled up, around 10 or 11 of them. There was a sort of shelf up above the table. You could not approach the shelf without getting on the table. There were no chairs around the table and no pictures in that room. I think there was a window near the table.

I went into the third [the front] room and George stayed in the second room. He was standing in front of the table; his hands were on the top of it; he was preparing to climb up on the table. In the third room I was looking at pictures hanging in frames on the wall, pictures of old fashioned people in old fashioned clothes. There were two old chairs; no table. I recall no other furniture in this room, nor any door leading to the outside. I stayed in the third room a minute or a minute and a half. When I came back into the second room George was getting off the table. He did not say anything to me at that time. He had in his hand two little round boxes. I thought they were just little boxes of face powder or something. They looked exactly like a woman's powder box.

When we got outside, George showed me one of the boxes and threw it away. Then with the other box he and I ran

to catch up with Arthur and Rudy to show them what George had found. Then we were all in a circle looking at it. George had the box in his hand and opened it and that is all I remembered. What I saw in the box was that I thought they were empty cartridges; they were copper color. (I know now they were dynamite caps.) There were around two or three layers of them, all piled up. I think Arthur just put his finger on them to see. That is the last thing that I noticed. I do not remember if any of the caps dropped on the pavement.

I knew at the time it was wrong to enter someone else's property but I didn't think of it then. I know what is right and wrong. At that time I didn't realize. I knew it was wrong to take things from other people's property. When George picked those boxes up or took them off the shelf and came out with them, I never thought about it being not right to do so. I did not think of it, although I did know it was wrong to take things away from other people's property. The reason I didn't think it was wrong taking those boxes, was that everything happened so quick I never thought of it.

I was in the fifth grade of school at the time. I had been going to this school about two weeks. Prior to that, all my schooling had been in Los Angeles. I could read and write the English language. I never had any particular trouble in passing my grades at school.

*Arthur Marino testified*: From the outside, the shack just looked like real old—the wood you could tell it was old and worn out, and all that. This was a kind of an old worn out building. I recall a front door on the south side. It had a lock on it. I am not sure if it was a padlock. I was just passing through there and would just glance at the thing. It had one window on it, on the orchard side. I am not sure if there was a window on the King Road side. I don't remember whether the window on the orchard side was boarded or not. I never tried to look into the building through that window. There used to be posters there about the races and the fair and some other things. I do not remember if I took any short cuts across that orchard. The only time I remember getting on that property was just on the edges of it. On that day I did not walk on the property. I never went inside the shack. I never saw anybody working in the orchard near the shack as I walked by on that day, nor any other time. I remember, before that time, seeing some people picking walnuts in the orchard across the road from the shack. I

had been going to this school about two weeks. I was thirteen and in the sixth grade. I could read and write English.

We had passed about two telephone poles, I don't know how many feet, when Nellie and George left us. I really don't know when they left. I was looking at a funny book. Then George and Nellie came running up to Rudy and me. By that time we had crossed to the east side of the road. When they came up George yelled at us and told us "look what I found" and he came up to us with a box in his hand; a round box, three inches across the top, brown colored cardboard, no writing on it, a plain box. I think George opened it, he was showing it to us. We were all looking at the contents. I thought they were empty shells, round like a bullet shell but copper colored from the inside and kind of shiny. I didn't know what they were, that's why I thought they were empty bullet shells. I do not remember any of them dropping to the pavement. I was trying to take one out, trying to pinch it and pull it out with my finger nails, that is when they exploded.

I was familiar with the shells from a .22 rifle. I knew that hammering the little cap on a .22 rifle shell would cause explosion and the bullet part of it to go out through the rifle. I knew that at that time.

*Rudolph Zuniga testified:* I did not notice anything about the shack, only that it was very old. I had seen this shack every day. As I recall it, it had one door and it was facing the orchard, and there was a window there, too, on the same side of the house. I think the door had just a regular lock, with a doorknob and a keyhole. I do not recall if it had a padlock. The window had boards nailed across it. I never tried to look into the window. I never knew what was inside the shack. I never actually played around it.

When Nellie and George returned to us that day Arthur and I had crossed to the right side of King Road. They had found something, George had. When I looked at the box it was already open. I was looking at it when the explosion occurred. That box was about two inches by one inch, looked like a woman's powder box. There was no writing on the box.

When I saw these things in this round box, they looked like shells from a .22 rifle. They were all fitted in there in orderly fashion. They were not just scrambled in the box loose. They were fairly compact. I am familiar with a .22

rifle bullet. I was at that time. I had fired a .22 rifle. At that time I did not know what dynamite caps were.

*Juan Marino, father of George, Nellie and Arthur, testified:* The land where the shack is and the surrounding lands are all in the country. The other properties are fenced but this one is not. There was an old barn on that property, where they stored something. It was about 200 feet from the shack, on the orchard side; no other buildings on that property. There were buildings to the north, about half a mile. On several occasions as I passed by I saw persons working there. I saw Mr. Valenti working there, out toward the middle of the orchard.

I believe George was below the mentality usual for children of his age. By that I mean I moved about a bit, going to work back and forth, to Los Angeles and back, and so the children did not attend school as regularly as they might have. I worked from place to place and took my family with me and sometimes that interrupted their schooling. They had the same understanding that other children of that age have.

*Michael Conversa, a press photographer, took a picture of the north end of the shack. He testified:* I took this picture on November 15, 1946, after the accident. It was an old shed and the lumber rather rotting away; the planks that made up this building were old and rotting away. (The picture, which is in evidence, shows a vertical board split lengthwise, with a horizontal break near the bottom, still fastened at the top, and tipping inward at an angle just above the horizontal break.)

The up and down crack in this board was an old crack. All the break that is around this board was old. The wood along the line of the horizontal break was a very dark color, just as wood appears when it is deteriorating. The face of that break was a darker color than the boards that faced the weather. It had a slight tint of green as wood deteriorates from rain and weather. I observed something on it similar to moss growing.

*Douglas Daly, a traffic officer of the California Highway Patrol, present when the picture was taken that day, testified:* Referring to that break in the board, the edges where the wood had been parted indicated that they were weathered and that the break had been there for some time. I would say it was an old break in the wood, the hole was there, the hole in the shed.

I found some of the dynamite caps; picked them up so

traffic would not run over them. They were long in shape, about an inch long.

*Robert Wiedner testified:* I have been acquainted with this property since about 1928. At one time my mother lived there in the house alone for a short space of time, in 1927 or 1928. I acquired it by inheritance in 1943. From 1943-1945 I was generally familiar with the contents of the shack. I did not know of the existence of dynamite or of any such caps as these on the premises. I sold this property to the defendants in September or October, 1945, on the agreement that I was to have the crop then on the trees and should deliver possession after harvesting, not later than February 1, 1946.

Christmas week, 1945, I cleaned out the shack and did not notice any boxes such as those here described. The next time I returned to this area from my home in Oakland was right after Christmas, 1945, or early January, 1946, at which time I turned the keys of the premises over to defendant Valenti. There were three keys; two to the house and one to the barn. One of the locks on the shack when I gave up possession was a brass padlock, which was not there when I inspected it during this trial. Before delivering possession I cleaned the place out, disposing of bottles, medicines, oil and general refuse, and removing furniture. I believe I left some furniture there and told the men who had been taking care of the place for me, they could have any of it they wanted. They may have taken a bed before I delivered up possession.

*Lowell W. Bradford, who qualified as an expert, testified:* A dynamite cap ordinarily has a compound known as fulminate of mercury or lead azide. They are equivalent in their ability to detonate with percussion or with fire. If the word "fulminate" were used, a dynamite cap that has fulminate of mercury would come within that category. Both fulminate of mercury and lead azide have explosive power greater than blasting powder. These substances are high explosives. I would classify dynamite caps as high explosives.

A dynamite cap is used to initiate or start an explosion and other explosive materials, and is known as a detonator. It would not propel a missile but it would rend other substances. It would come within the classification of rending other substances. The caps can be started by a blow, or by a fuse which burns into the cap and sets it off. They become even more sensitive, highly sensitive, when they decompose, as when exposed to dampness. They should be kept in a dry place

of storage, with a range of temperature of but five to ten degrees Fahrenheit, with a mid range of about 70 degrees, and subject to inspection at all times. When there is deterioration it is possible that a dynamite cap will go off on the mere handling of it. The explosion of one cap in close proximity to other caps would cause the others to go off.

*Defendant Sam Valenti, called by the plaintiffs under section 2055 of the Code of Civil Procedure, testified:* We bought this 20 acres about September, 1945, from Mr. Wiedner. The house was in good shape. No one was living in it. It had some things stored in it. Mr. Wiedner wanted time to find a place for them. He kept the keys to it and gave us only one key, the key to the barn. About 40 days after we bought he came here and opened the door to the house but I did not go in. At that time I had dug out trees all over the ranch with a tractor. Some man did it for me; used no dynamite caps to get the trees out. I never saw dynamite in my life. I never saw Wiedner again after that time. He never sent or gave me a key to that house. Neither I nor my partner has a key to it. I never put a lock on that door. I have never been inside that house.

Prior to November, 1946, I never saw children coming on my property. I knew the school bus stopped there, it stopped on the other side of the street.

*Defendant Luigi Travaglina, also called by the plaintiffs under section 2055, testified* to much the same effect as did Valenti.

### SUMMARY OF THE FACTS

In appraising this evidence, as in the case of any appeal from an order of nonsuit, we must disregard conflicting evidence, give to plaintiffs' evidence all the value to which it is entitled, indulge in every legitimate inference which may be drawn from that evidence, and, if more than one inference reasonably may be drawn, take the view most favorable to the plaintiffs. (*Stockwell* v. *Board of Trustees,* 64 Cal.App.2d 197, 200-201 [148 P.2d 405], and cases there cited.) The testimony of the defendants, given under section 2055 of the Code of Civil Procedure, should be considered but those portions of it which are unfavorable to the plaintiffs should be disregarded. (*Jeppi* v. *Brockman Holding Co.,* 34 Cal.2d 11, 18 [206 P.2d 847]; *Young* v. *Bank of America,* 95 Cal. App.2d 725, 729 [214 P.2d 106, 16 A.L.R.2d 1155].)

This shack in its dilapidated and uninhabited condition, clearly visible and readily accessible to children passing by,

with a broken board furnishing easy entrance, the jury reasonably might conclude was a lure to children; accented by the fact that George made straight for that broken board at a rapid pace and did enter and explore. They might also reasonably conclude that defendants as owners and operators of this property were aware of these facts and that they, especially Valenti who personally farmed this land and knew that the school bus regularly stopped nearby, knew or should have known that children frequently were in the vicinity of the shack and were likely to be attracted to and into it.

The jury could have no doubt that these dynamite caps were highly explosive, not alone from the testimony of the expert but also from the very fact that one or more exploded, not from percussion or fire, but by the mere attempt of Arthur to remove one from the little box with his fingernails. They could find that defendants knew or should have known of the presence of caps on the shelf in little, unlabeled cardboard boxes exposed to the view of any child who might enter, and in surroundings suggestive of abandonment, tending to make George and Nellie less conscious than they otherwise might have been that it would be wrong to take these little boxes that looked like women's powder boxes.

Would these facts support a finding that these defendants owed these children a duty which defendants violated and that such violation was the proximate cause of the injuries?*

### DISCUSSION OF ISSUES OF LAW

In our search for the answer, we start with the principle that a man must so use his property as to cause no unreasonable harm to another. He thus owes certain duties to the owner or occupier of neighboring land and to persons who come upon his land, such as licensees and invitees.

It has been said that he owes no duty to trespassers upon his land, to put or keep it in a reasonably safe condition for them, or to conduct his activities in a manner not to endanger them. Yet, a number of exceptions to this rule concerning trespassers have developed. It is mitigated to some extent if the landowner discovers a trespasser on his premises or knows that they frequently enter upon or cross over a por-

---

*In separating these questions, for convenience of discussion, from those which preceded, we must not lose sight of the principle that it is the function of the trier of the facts to determine both; i.e., it is the function of the jury, under proper instructions, to determine the ultimate fact of negligence. (*Stockwell* v. *Board of Trustees, supra,* 64 Cal.App.2d 197, 203.)

tion of his property, especially if they may there encounter extremely hazardous conditions.

■ Another exception runs in favor of trespassing children if their trespass is foreseeable, if the condition of the premises involves an unreasonable risk of harm to them in view of their immaturity, and if the burden of rectifying the condition is slight in comparison with its usefulness and the magnitude of the risk.

This exception in favor of trespassing children had its beginning in the so-called "turn-table" cases, characterized at the time as "attractive nuisances," an unfortunate term to have used, evidenced by the difficulties later encountered in applying the term. (See Prosser on Torts, 1941, pp. 617-620.) More descriptive and less confusing, we think, would be the expression "injuries to trespassing children."

We derive the applicable principles and standards from the decisions of the courts of this state. Some of the cases are a bit difficult to reconcile, one with another. (See 41 Cal. L.Rev. 138; Hastings L.J., 1951, p. 91; 24 So.Cal.L.Rev. 504.)

■ Our review of the decisions in this state convinces us that the rule today in California is substantially as expressed in section 339 of the Restatement of the Law of Torts: "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein."

Chief Justice Beatty in 1896 gave voice to the basic ideas in these words: "The owner of a thing dangerous and attractive to children is not always and universally liable for an injury to a child tempted by the attraction. His liability bears a relation to the character of the thing, whether natural and common, or artificial and uncommon, to the comparative ease or difficulty of preventing the danger without destroying or impairing the usefulness of the thing, and, in short, to

the reasonableness and propriety of his own conduct, in view of all surrounding circumstances and conditions. As to common dangers existing in the order of nature, it is the duty of parents to guard and warn their children, and, failing to do so, they should not expect to hold others responsible for their own want of care. But, with respect to dangers specially created by the act of the owner, novel in character, attractive and dangerous to children, easily guarded and rendered safe, the rule is, as it ought to be, different; and such is the rule of the turntable cases, of the lumber-pile cases, and others of a similar character. But the owner of a thing dangerous and attractive to children is not always culpable, and therefore is not always liable for an injury to a child drawn into danger by the attraction. It is necessary to discriminate between the cases in which culpability does and does not exist. In the Illinois case cited by counsel, the city of Pekin was held to have been culpable in excavating a deep pit within the city limits, which afterwards filled up with water. It might be granted that that case was well decided and the principle of the turntable cases properly applied, without holding that this defendant is similarly liable. There the existence of a pond in a thickly peopled quarter was due to the act of the party charged. Here, the existence of the pond was due to the exercise, by the city of San Francisco, of a power and authority which the defendant could not lawfully resist. By the act of the city, and without any fault on his part, his lot was converted into a pond. He might, it is true, have filled it up; but he was no more bound to do so than if it had been a natural pond, because it was in no respect more of a nuisance than it would have been if it had been there before the city was laid out.'' (*Peters* v. *Bowman*, 115 Cal. 345, 356-357 [47 P. 113, 598, 56 Am.St.Rep. 106].)

In 1919, we had the case of an intelligent boy 11 years old who, with his brother and another lad, entered a mine to play. It was on a Sunday. No work·was being done in or about the mine. After entry, this boy entered an old tunnel and fell to his death in a stope which was 500 feet deep and filled with water below the 140-foot level. At the time of the accident and for some months prior thereto the stope was open and unprotected. The reviewing court affirmed a judgment against the mine owner or operator in an action for the death of the boy. (*Faylor* v. *Great Eastern Q. Min. Co.*, 45 Cal.App. 194 [187 P. 101]; opinion by Justice Beasly,

pro tempore, Justices Richards and Kerrigan concurring. The Supreme Court denied a petition for a hearing by that court.)

The court recorded its extensive review of the authorities (pp. 200-204) and declared the applicable rule in this state as follows: "Those who place an attractive but dangerous contrivance in a place frequented by children, and knowing, or having reason to believe, that children will be attracted to it and subjected to injury thereby, owe the duty of exercising ordinary care to prevent such injury to them, because such persons are charged with knowledge of the fact that children are likely to be attracted thereto and are usually unable to foresee, comprehend, and avoid the danger into which they are thus knowingly allured. [Citations.]" (Pp. 199-200 of 45 Cal.App.) Some of the earlier California cases were considered and distinguished at pages 202 to 204. The court especially emphasized as a distinguishing element in the case before it, the fact that there "the danger was distinctly a concealed danger" (p. 203), noting also the element of lure to children and the foreseeability of their coming to play. The artificiality of the dangerous condition (a man-made condition, not one created by nature) was, of course, obvious.

Other similar cases are *Sanchez* v. *East Contra Costa Irr. Co.*, 205 Cal. 515, 516 [271 P. 1060], a man-created deep hole in the bottom of an irrigation ditch; *Blaylock* v. *Jensen,* 44 Cal.App.2d 850 [113 P.2d 256], a concealed oil sump into which the landowner knows or has reason to believe a trespasser will probably fall; *Long* v. *Standard Oil Co.*, 92 Cal.App.2d 455 [207 P.2d 837], an artificial hole in the ground partly filled with water, the surface of which bore a considerable resemblance to the surrounding soil.

In 1933, there was the case of a 12-year-old boy who, the complaint alleged, found some apparently abandoned dynamite caps on a railroad right of way which was commonly used by the general public. He was injured by the explosion of one or more of these caps. All of the elements required by section 339 of the Restatement apparently were pleaded. The reviewing court reversed a judgment based upon an order sustaining a demurrer to the complaint. (*Lambert* v. *Western Pac. R. R. Co.*, 135 Cal.App. 81 [26 P.2d 824]; petition for hearing by the Supreme Court was denied, p. 90.)

In ascertaining the applicable rule, the court seemingly placed considerable reliance upon the principles enunciated by Chief Justice Beatty in *Peters* v. *Bowman, supra,* 115

Cal. 345 at 356. In distinguishing some of the seemingly inconsistent decisions which had intervened, the court in the Lambert case put undue emphasis, we think, upon the element of ''mere technical trespass,'' found present in that case. It would be extremely hazardous to determine as a matter of law, the degree of moral turpitude of a trespassing child. Let the trier of the facts pass upon it, in the absence of clear and positive proof that the child in question possessed maturity of judgment and inhibiting faculties of such degree and quality that reasonable minds would not differ in drawing the inference that he did not need and was not within the scope of the protection of the rule under discussion.

A few early cases of seemingly adverse import merit consideration. In *Nicolosi* v. *Clark* (1915), 169 Cal. 746 [147 P. 971, L.R.A. 1915F 638], the Supreme Court affirmed a judgment which had been entered upon the sustaining of a demurrer to the complaint in an action by a 10-year-old boy who was injured by the explosion of a dynamite cap which he had taken from a street-work contractor's tool and implement box. The caps were in a small box which was inside the tool box. The latter was in the street, 3 feet from the sidewalk. The boy was simply passing along and the large box engaged his attention. The court found the boy negligent as a matter of law, saying that a child that age, unless mentally deficient, is chargeable with knowledge that he has ''no right to make free with the contents of box placed such as this, manifestly a box belonging to other people and containing their goods.'' (P. 748.) It is difficult to reconcile this case with the later case of *Katz* v. *Helbing*, 205 Cal. 629 [271 P. 1062, 62 A.L.R. 825], discussed later on in this opinion.

The Nicolosi case was followed in *Hale* v. *Pacific Tel. & Tel. Co.* (1919), 42 Cal.App. 55 [183 P. 280]. The defendant was using an unenclosed cottage for the storage of materials needed on a nearby construction job. A box was left on the porch over the weekend. The top of the box was nailed down flush on one end, the other being lightly tacked. Within was a small tin box containing dynamite caps, covered with excelsior. The boy entered the porch, pried open the top of the large box, removed the excelsior, found the tin box, opened it, and took out 20 of the caps. He gave some to a playmate who was injured while playing with them. A judgment for the playmate was reversed. The wrongful act of the 8-year-old was an intervening cause which broke the

chain of connection, if any, between the plaintiff and the defendant. The significant factor was that the 8-year-old testified "that he knew that it was both morally and legally wrong to take the caps from the box." (P. 59.) Accordingly, "his connection with the matter, in so far as it affects plaintiff, must be deemed that of an adult and *sui juris.*" (P. 58.) It could not be said under those circumstances, that defendant was bound to anticipate the act committed and guard against its consequences. Upon that basis, the decision in the Hale case was consistent with the rule as declared in section 339 of the Restatement.

*Bradley* v. *Thompson* (1924), 65 Cal.App. 226 [223 P. 572], was another dynamite cap case. It came up on the sustaining of a demurrer to the complaint in an action by an 11-year-old boy who found the caps in a tin box which defendant had placed on a cross-beam, 3 feet from the ground, which supported a shed situate a few feet from a public road. The boy, passing by, delivering newspapers, was attracted to the box. The court said that this case was ruled by the decision in the Nicolosi case. Accordingly, the complaint in the Bradley case was deemed insufficient for failing to allege that the plaintiff was deficient in understanding and did not realize the culpability of his conduct. Consequently, there was "nothing in the complaint to justify the inference that defendant knew, or had reason to believe, that a boy of eleven years, of average intelligence and possessing the moral sense usual in a lad of that age, would enter defendant's close and purloin these dynamite caps." (P. 233.) It would appear, therefore, that the courts in the Nicolosi and Bradley cases did not necessarily disallow any portion of the rule under discussion. In applying it they simply looked upon a 10- or an 11-year boy of average intelligence as if he were an adult, and did so as a matter of law. That concept was later modified by making the question of the capacity and accountability of a child of such an age a question of fact, not of law.

In 1928 the Supreme Court had for consideration a complaint which alleged that the defendants negligently maintained a supply of lime or mortar upon the sidewalk in front of a building they were constructing; that defendants knew that small boys were taking wet lime and mortar and throwing it at passing streetcars; that a small and irresponsible boy of 10 years picked up some of this lime or mortar and threw it at a streetcar on which plaintiff was a passenger, a portion of which hit plaintiff, to his injury. The court

reversed the judgment which had been entered upon sustaining a demurrer to this complaint. (*Katz* v. *Helbing, supra,* 205 Cal. 629.) The court took cognizance of the custom of leaving such materials in boxes in front of a building under construction, but held that if experience had demonstrated that incidents such as this were likely to occur it would be wrongful to so leave them if "a reasonably prudent man would have foreseen that injury would probably result." (P. 634.) ▉ Intervening wrongful acts of third persons ordinarily break the chain of causation, but "this is not always the case, especially where the acts of children of a nonresponsible age are involved." (P. 634.) The allegations of this complaint would permit proof "showing that the frequency, extent, and character of the small boys were such as to create liability on the part of the defendants . . ." (P. 635.) ▉ Evidence would be admissible to show whether defendants had warned the boys of the dangerous character of their acts, and whether the defendants could have moved these materials to some less accessible place. ▉ It could not be said as a matter of law that an 11-year-old boy, presumed to possess average intelligence for his age, is a responsible agent. ▉ The age at which a child attains the capacity of being held responsible for his conduct is one of fact for determination by the trier of the facts. Each case must be determined by its particular facts. "Negligence is relative to time, place and circumstances. There is no fixed rule which may be universally applied. The question here is, what was the duty of the respondents, knowing what they are charged with knowing and seeing what the complaint alleges they saw? If reasonably prudent persons would, under the allegations of the complaint, have adopted or taken steps to adopt some measure to protect the public against the repetition of the acts which recurred during five successive days, and we are of the view that they would have taken such steps, then it became the duty of defendants to act in a similar manner. It would then become a demonstrable proposition that the lime in its semisolid state was attracting the immature and thoughtless as a substance for child-like amusement. That it was a dangerous substance to scatter about in thickly populated districts must be known to adult persons.

"Call the lime in its mixed form an attractive nuisance, or what you may, the basic fact remains that if the allegations of the complaint be taken as true, the defendants owed

to the general public protection from annoyance and injury arising from a condition which they had caused to exist and which they knew was tempting and impelling youthful minds to deeds that were likely to bring damage to innocent persons lawfully using the public sidewalks and streets. Every person in his intercourse with his fellows owes to them certain natural, inherent duties, of which all normal persons are conscious, among which is the duty of protecting life and limb against peril when it is in his power to reasonably do so." (P. 638.)

This landmark decision should settle all doubt concerning the applicable rule when a trespassing child is injured.

One case of opposite import should be mentioned. In *Puchta* v. *Rothman,* 99 Cal.App.2d 285 [221 P.2d 744], the majority opinion reviews the authorities and concludes that section 339 of the Restatement substantially expresses the rule in this state, subject to certain limitations, saying in part, "A building under construction, being immobile for one thing, is readily distinguishable from an attractive, moving vehicle . . ." (p. 289), and in effect holding that a trap created by covering a hole with tarpaper could not have been obviated without undue burden to the owner or the builder of the structure. We find Justice Dooling's dissent (pp. 291-293) the more persuasive of the two opinions in that case, and refer to his opinion for a clear and incisive analysis. (Apparently none of the parties petitioned for a hearing by the Supreme Court.)

Especially significant in our case are the highly explosive character of the materials which constituted the dangerous condition, and their attractive form, shiny copper-colored objects which resembled .22 caliber cartridges. ▮ The trend of decision in this country is that the possessor of explosives owes a high degree of care to avoid injury to children who might have access to them. That appears to be so even in states that do not adhere to the "attractive nuisance" doctrine; also, in situations where that doctrine might not apply. (See the comprehensive note on this subject in 10 A.L.R.2d 22-186.)

▮ Then, too, we have a statute which prescribed minimum standards for the care and storage of "explosives," defining them as including "gunpowder, blasting powder, dynamite, gun cotton, nitro-glycerine compound, *fulminate,* or *an explosive substance having an explosive power equal to or greater than black blasting powder,"* also including *"a*

*substance to be exploded or ignited to produce a force for* propelling missiles or *rending other substances.''* (Health & Saf. Code, § 12000, as it read in November, 1946; emphasis added.) The testimony of the expert in this case indicated that the dynamite caps here involved came within the scope of this definition.

Except at an explosive manufacturing plant, ''no person shall possess, keep, or store any explosive which is not completely inclosed in a tight metal, wood, or fiber container.'' (Health & Saf. Code, § 12150.) Except while being transported or while in the custody of a common carrier, ''every explosive shall be kept or stored in one of the two classes of magazines specified in this chapter [ch. 3, pt. 1, div. 11, comprising §§ 12150-12220].'' (Health & Saf. Code, § 12151.) A magazine of the second class here applies, ''a stout box in which not more than one hundred pounds of explosives are stored or kept'' (§ 12210). ''A sign on which are printed legibly the words, 'magazine,' 'explosives,' 'dangerous' shall be kept posted in a conspicuous place on the magazine.'' (§ 12211.) ''Except when opened for use by authorized persons the magazine shall at all times be kept securely locked.'' (§ 12212.) Violation of any of these provisions is punishable by a fine of $25 to $1,000 or by imprisonment not more than six months, or both. (§ 12220.)

These provisions of the code prescribed minimum standards of care for the custody and storage of the dynamite caps here involved. They emphasize, lend force, and give concrete expression to the high degree of care which the law, even without the aid of the statute, would impose upon the possessor of highly explosive substances, especially toward children who may have access to them, including children who gain access by trespassing. We need not be presently concerned with the question of possible negligence *per se* in the event of a violation of this statute. The minimum standard of care which the statute imposes and the requisite high degree of care which that denotes are the factors of special significance in the present inquiry.

We conclude that the facts in evidence show a prima facie case of violation of a duty of care owed by these defendants toward these children, a violation which was the proximate cause of the injuries, bearing in mind the rules applicable upon a motion for nonsuit, differing as they do from those which govern the trial court upon a motion for new trial

or a reviewing court on appeal from a judgment entered upon the verdict of a jury or upon the findings of a trial judge.

In view of this conclusion, we need not consider defendants' contention of no liability toward Arthur and Rudolph, predicated upon the claim that George's was an intervening act of a responsible person presumed to know the nature of his trespass and asportation. The nature of George's conduct, as we have indicated, was under the circumstances of this case, a question for the jury. True, Nellie said she observed nothing which might have attracted George. Yet, he was attracted. That and other facts bearing on that question were in evidence for appraisal by the jury.

Defendants also suggest that even if the shack was an "attractive nuisance" there can be no recovery because it was a dynamite cap within the shack, not the shack, which caused the injury. That is not the law, whether we look upon the caps as an attraction within an attraction or as a concealed highly dangerous condition, a "trap," on the premises. We consider that this is more appropriately viewed as a prima facie case of liability measured by the tests indicated in section 339 of the Restatement of the Law of Torts, which our review of the case law convinces us expresses the California rule concerning injuries to trespassing children.

We have two appeals: One from a minute order which did not direct that a written order be prepared, signed and filed; the other, from a written order which in fact was later filed. Both appeals, taken March 27, 1952, were timely. Under these circumstances, the minute order was the appealable order. (Code Civ. Proc., § 581d; rule 2(b) of Rules on Appeal; *Costa* v. *Regents of the University of Cal.*, 103 Cal. App.2d 491 [229 P.2d 867].)

The minute order appealed from is reversed and the appeal from the written order is dismissed. Appellants will recover costs.

Peters, P. J., and Bray, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 28, 1953. Shenk, J., and Traynor J., were of the opinion that the petition should be granted. Dooling, J., and Schottky, J., acting in place of Edmonds, J., and Schauer, J.