[Civ. No. 36520. Second Dist., Div. Two. July 13, 1971.]

WILLIAM EUGENE REIDA et al., Plaintiffs and Appellants, v. ROBERT H. LUND, as Administrator, etc., et al., Defendants and Respondents.

## COUNSEL

Halde, Barrymore & Stevens, Edward L. Lascher and Richard E. Rader for Plaintiffs and Appellants.

Demler, Perona, Langer & Bergkvist, James T. Perona and Michael R. Coulter for Defendants and Respondents.

## OPINION

**FLEMING, J.**—Michael Clark, aged 16, left his home in Long Beach shortly after 8 o'clock on the evening of 24 April 1965, taking without permission a family automobile, credit cards, and his father's 6.5 x 55

millimeter Swedish Mauser military rifle equipped with telescopic sight. About 6 o'clock the following morning he stationed himself near Santa Maria on a hill overlooking Highway 101 and began firing at passing automobiles, as a consequence of which three persons were killed and others seriously wounded. When the police moved in on his position, Michael put the rifle to his head and killed himself.

William, Lucille, and Kim Reida, victims of Michael's shooting, brought this action for personal injuries and wrongful death against Michael's estate and against Forest Clark and Joyce Clark, Michael's parents. The complaint charged the parents with negligence in the training, supervision, and control of Michael, and negligence in making firearms available to him. A summary judgment was entered in favor of the Clarks, and the Reidas have appealed.

The declarations, interrogatories, transcripts, and depositions presented to the trial court on the motion for summary judgment disclosed the following facts. Forest Clark was a Long Beach businessman, a veteran of two wars, an active member of his church, and the father of three children, Michael, 16, another son 15, and a daughter, 10. Michael, a student of average scholastic ability in the eleventh grade at Woodrow Wilson High School, was friendly, quiet, neat, a member of the Boy Scouts, and a member of the Sea Scouts. He liked music, dances, and sports, and he played saxophone in the high school band. He got along well with others, including his brother and sister. He regularly attended church with his family, he did not use alcohol or drugs, he never displayed emotional instability, nor had he ever been in trouble with the school authorities, the police, or the juvenile authorities. According to the father's declaration Michael had never intentionally harmed anyone prior to the shootings. In 1961 Forest Clark purchased a Mauser rifle and converted it into a hunting rifle with telescopic sight. On two occasions, the first on a rifle range and the second on a hunting trip, he showed Michael how to operate the rifle. Together with a sack of steel-jacketed military ammunition, the rifle was stored in the garage in a locked cabinet to which there were two keys, one which was regularly kept in the father's dresser drawer in a location known to Michael, and the other which had disappeared earlier but whose whereabouts were known to the younger son. On the night of Michael's disappearance the father did not know the rifle had been taken, and he did not discover it until the morning of the shootings.

Joyce Clark, a housewife and school teacher, declared that to her knowledge her son Michael had been congenial, non-aggressive, and without emotional problems. He never intentionally injured any living thing and she could not explain why he had acted the way he had. She had not known the rifle was missing until after the shootings took place.

In opposition to the motion plaintiffs filed the declaration of a psychologist, who said he had read the Clarks' declarations, the transcript of the coroner's inquest, and newspaper articles about the shootings. On the basis of his reading he concluded: that Michael suffered from schizophrenia, paranoid type; that the symptoms of this disease must have been apparent to the Clarks; that the Clarks knew or should have known that Michael was capable of violent, irrational acts and might use any weapon available to him; that their denials of such knowledge were inconsistent with Michael's behavior at Santa Maria and therefore incredible.

Plaintiffs' complaint in effect charged two kinds of negligence: (1) failure of the Clarks to train, control, and supervise Michael, and (2) failure of Forest Clark to keep the rifle out of Michael's hands. █ A summary judgment was proper only if the declarations of the moving parties were sufficient to sustain a judgment in their favor and the declarations of the opposing parties did not show facts sufficient to present a triable issue. (*R.D. Reeder Lathing Co.* v. *Allen,* 66 Cal.2d 373, 376 [57 Cal.Rptr. 841, 425 P.2d 785].)

## I

No triable issue of fact appeared with respect to the Clarks' asserted failure to train, control, and supervise Michael. █ Parents are responsible for harm caused by their children only when it has been shown that "the parents as reasonable persons previously became aware of habits or tendencies of the infant which made it likely that the child would misbehave so that they should have restrained him in apposite conduct and actions." (*Weisbart* v. *Flohr,* 260 Cal.App.2d 281, 291 [67 Cal.Rptr. 114].) █ The Clarks adamantly denied any forewarning of Michael's behavior. After ample opportunity for investigation and discovery, the Reidas offered nothing but the bald conclusion of a psychologist who had never met any member of the Clark family that the Clarks were not telling the truth. █ Ordinarily, affidavits containing no more than conclusions and opinions are insufficient. (*Fuller* v. *Goodyear Tire & Rubber Co.,* 7 Cal.App.3d 690, 693 [86 Cal.Rptr. 705].) Here the only supporting data in opposition to the summary judgment consisted of: (1) a diagnosis of mental disease, said to be paranoid schizophrenia, arrived at from depositions and newspaper reports by a person who was neither a physician nor a psychiatrist; (2) a conclusion by the diagnostician that symptoms of the disease must have been obvious to the parents; (3) an expression of the diagnostician's disbelief in the trustworthiness of contrary declarations tendered by the Clarks. █ Such data lacks even a modicum of evidentiary value, for it amounts to no more than the psychologist's personal and unsupported expression of disbelief in the testimony of another. █ Causes may

arise in which knowledge of events remains so confined within the bosom of a declarant that proof to controvert the declarant's version is difficult to come by and therefore of necessity excused. (See *Frye* v. *Felder,* 246 Cal.App.2d 136, 138-139 [54 Cal.Rptr. 627]; Bauman, *California Summary Judgment: A Search for a Standard,* 10 U.C.L.A. L.Rev. 347.) **(3c)** In this instance, however, the Clarks' version of Michael's life was verifiable. If Michael's asserted paranoid schizophrenia had been obvious to his parents it would have been manifest in some degree to other persons —teachers, doctors, fellow students, friends, acquaintances, neighbors. The names of such persons had been furnished the Reidas, yet the latter produced no evidence whatever to contradict the declarations of the Clarks on the motion for summary judgment.

Plaintiffs suggest the doctrine of res ipsa loquitur established a presumption that from the happening of the criminal events which took place the parents must have been at fault in the upbringing of their son. We think this contention is fully answered in respondents' brief: Is this tragic event of such a nature that one could say it was probably the result of negligence of the parents in bringing up the child? If so, would not every criminal act of a minor against the property or persons of others call for explanation by the parents? Should parents be subjected to trial by jury under res ipsa loquitur if they cannot give an explanation? Appellants argue that human experience and common knowledge suggest that this sort of tragedy does not customarily occur if a child is carefully observed and managed by its parents. But such tragedies do not customarily occur at all. When they do occur the question of probable causation is too complex to allow a jury to apply res ipsa loquitur from the mere happening of the event and from the parents' inability to furnish an explanation for it.

We conclude that summary judgment was properly entered in favor of Forest Clark and Joyce Clark on the issue of negligence in the training, supervision, and control of Michael.

## II

The other phase of the complaint centers on the failure of Forest Clark to keep his rifle out of Michael's hands. In his declaration and deposition Forest Clark admitted he kept the rifle and its supply of ammunition in the family garage in a locked cabinet, that Michael knew where one key to the cabinet was, and as it turned out, both Michael and his younger brother knew where the other key was, too. On this aspect of the summary judgment the question is whether the possibility of negligent safeguard of the firearm and its ammunition is sufficiently tangible to require resolution of the issue by a trier of fact.

■  A Swedish Mauser military rifle is a lethal weapon whose sole function is to kill human beings and animals of comparable size. It follows that a person dealing with a weapon of this kind is held to the highest standard of due care (*Jensen* v. *Minard,* 44 Cal.2d 325, 328 [282 P.2d 7]), even a slight deviation from which may constitute negligence in the safeguarding of such a dangerous instrument (*Warner* v. *Santa Catalina Island Co.,* 44 Cal.2d 310, 317 [282 P.2d 12]). In Pollock's Law of Torts (15th ed. 1951) page 386, the author declares that the risk incident to dealing with firearms and explosives subjects the actor to strict responsibility, and that the amount of caution required of the actor is sometimes described as consummate care. The author then says, "It is doubtful whether even this is strong enough." In his concurring opinion in *Jensen* v. *Minard,* 44 Cal.2d 325, 330 [282 P.2d 7], Justice Carter declared that the standard of due care is so high that it "would appear to border on the doctrine of strict liability."  ■  Nevertheless, it is established that use of firearms does not fall within the category of ultra-hazardous activity which may result in the imposition of absolute liability. (*Orser* v. *George,* 252 Cal. App.2d 660, 672 [60 Cal.Rptr. 708].)

Negligent safeguard of firearms, as differentiated from negligent use, has been dealt with only indirectly under California law. In *Hagerty* v. *Powers* (1885) 66 Cal. 368 [5 P. 622], the complaint alleged that defendant-father allowed his minor son to possess a loaded pistol. No cause of action was stated, said the court, because under the then rule a father could not be held liable for the torts of his son. In *Figone* v. *Guisti* (1919) 43 Cal. App. 606 [185 P. 694], defendant-father was charged with negligently placing his son within reach of a loaded revolver. Following the *Hagerty* precedent, the court concluded no cause of action was stated. Cases involving BB guns (*Martin* v. *Barrett,* 120 Cal.App.2d 625 [216 P.2d 551]), and rocks (*Singer* v. *Marx,* 144 Cal.App.2d 637 [301 P.2d 440]) are clearly inapposite.

When we review the law elsewhere we find a majority of other jurisdictions have considered it actionable negligence for a person to leave a firearm in a place where he should foresee it might fall into the hands of a child. (See Annot., 68 A.L.R.2d 782.) Two leading British cases are instructive. In *Dixon* v. *Bell* (1816) 5 M. & S. 198 [105 Eng. Reprints 1023], defendant sent his young servant girl to fetch a gun from the house of another with a message that the priming should first be removed from the gun. The girl pointed the gun in sport at a child and pulled the trigger, seriously wounding the child. The defendant was held liable: "It was incumbent on him who, by charging the gun, had made it capable of doing mischief, to render it safe and innoxious. This might have been done by the discharge or drawing of the contents. . . . The gun ought to have been

so left as to be out of all reach of doing harm." And in *Sullivan* v. *Creed* (1903) 2 Ir.R. 317 [2 B.R.C. 139], defendant left a loaded gun standing inside a fence on his lands. His son, 15, found the gun, and, not knowing it was loaded, playfully pointed it at plaintiff, who was standing on a nearby public road. The gun went off and plaintiff lost an eye. Defendant was held liable, Palles, C.B., declaring, "I hold that anyone who is in possession of a dangerous instrument owes a duty to the public, or at least to such members of the public as are reasonably likely to be injured by its misuse, to keep it with reasonable care, so that it shall not be misused to the injury of others." (P. 152.) And Fitz Gibbon, L.J., declared: "The ground of liability here is not that the boy was the defendant's son, but the fact that the gun was left without warning, in a dangerous condition, within reach of persons using the pathway, and the boy was one of the very class of persons whom the defendant knew to be not only likely but certain to pass by, *viz.*, his own household." (P. 164.)

Some American decisions have gone equally far in permitting recovery where a gun left loaded by defendant has been acidentally discharged by another person. In *Kuhns* v. *Brugger,* 390 Pa. 331 [135 A.2d 395, 68 A.L.R.2d 761], a grandfather was held liable for injuries inflicted by his grandchild with a loaded gun which the child found in the grandfather's bedroom in an unlocked dresser drawer. The court characterized the duty placed on the grandfather as one of extraordinary care to see that no harm would be visited upon others as a consequence of his conduct. See also, *Dickens* v. *Barnham,* 69 Colo. 349 [194 P. 356, 12 A.L.R. 809]; *Salisbury* v. *Crudale,* 41 R.I. 33 [102 A. 731]; *Giguere* v. *Rosselot,* 110 Vt. 173 [3 A.2d 538].

The general direction in which the law is moving with respect to liability for the use of firearms may be seen in the provisions of Civil Code section 1714.3 adopted by the California Legislature in 1970. That section makes a parent liable in an amount up to $30,000 for injury proximately caused by the discharge of a firearm by his child under the age of 15 if the parent permitted the child to have the firearm or left it in a place accessible to the child. The statute is one which appears to impose an absolute liability within its stated conditions and which specifically declares that its liability is in addition to any other liability imposed by law. █ The statute, of course, is not applicable here, but even if it were it would not foreclose an additional liability on the parent based on negligent safeguard.

When we turn from the safeguard of firearms to the safeguard of other dangerous instrumentalities we find that the sufficiency of the safeguard is usually an issue of fact for the jury. ██ The possessor of deadly instrumentalities, such as dynamite caps, has a duty to keep them from

the reach of children, and the degree to which he has complied with that duty presents a jury question. (*Marino* v. *Valenti,* 118 Cal.App.2d 830 [259 P.2d 84].) In *Stephens* v. *Blackwood Lumber Co.,* 191 N.C. 23 [131 S.E. 314, 43 A.L.R. 426], the question of negligence was held an issue for the jury where a child died of injuries when he struck a match to blasting powder he had found stored in defendant's mill. The mill was frequented by customers and children and the door did not have a lock. In *Butrick* v. *Snyder,* 236 Mich. 300 [210 N.W. 311], a child was injured while playing with a dynamite cap found in an open tool shed. The court said: "Whether a reasonably prudent person, with a knowledge of the conditions surrounding the building and the use which the school children would probably make of this unfenced and unoccupied land, should have anticipated the danger incident to leaving these caps as they were left in the shed, was, we think, a question for the jury." (210 N.W. at pp. 313-314.) In *Tayloe* v. *Southern Bell Telephone & Telegraph Co.,* 258 N.C. 766 [129 S.E.2d 512], the court said at page 514: "To discard or leave a dynamite cap where either a child or an unversed adult might pick it up and cause it to explode is positive negligence. Both the common law and the statutes of North Carolina require persons having possession and control of dynamite to use the highest degree of care to keep the explosive safe and to secure and to guard others against injury from it." In *Kingsland* v. *Erie County,* 298 N.Y. 409 [84 N.E.2d 38, 10 A.L.R.2d 1], the court found a county fair association and a contractor who undertook to display fireworks at the fair negligent because they had left fireworks exposed and unguarded at night on the fairgrounds.

We have also considered the somewhat analogous liability which results from leaving keys in an unattended vehicle. In *Hergenrether* v. *East* (1964) 61 Cal.2d 440 [39 Cal.Rptr. 4, 393 P.2d 164], plaintiff was injured in an automobile accident brought about by the negligent operation of defendants' vehicle by an unapprehended and unidentified thief. The vehicle had been left with its doors unlocked and its keys in the ignition switch. The court concluded that defendants were liable to plaintiff for negligence because of the following circumstances: (1) the vehicle had been left in a high-crime area, (2) the neighborhood was one heavily populated with drunks, (3) the vehicle was intended to be left out all night, and (4) the vehicle was a 2-ton truck, more dangerous and difficult to operate than an ordinary automobile. Said the court: ". . . each case must be considered on its own facts to determine whether the joint effect of them in toto justifies the conclusion that the foreseeable risk of harm imposed is unreasonable, and that the defendant owner or one in charge of a vehicle has a duty to third persons in the class of the plaintiffs to refrain from subjecting them to such risk." (61 Cal.2d at p. 445.) Most jurisdictions

explicitly or implicitly recognize that a person who leaves a vehicle in such condition that it may be easily started by a stranger may be held liable for negligence. (51 A.L.R.2d 633, Annot., Liability for damage or injury by stranger starting motor vehicle left parked on street.)

Finally, we have the analogous situation of liability imposed on a vendor who furnishes alcoholic drinks to an intoxicated customer who later injures a third person. The Supreme Court of California, in upholding such a liability in *Vesely* v. *Sager* (1971) 5 Cal.3d 153 [95 Cal.Rptr. 623, 486 P.2d 151], thus summarized the governing rules: "Under these principles an actor may be liable if his negligence is a substantial factor in causing an injury, and he is not relieved of liability because of the intervening act of a third person if such act was reasonably foreseeable at the time of his negligent conduct. [Citations.] Moreover, 'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious or criminal does not prevent the actor from being liable for harm caused thereby.' (Rest.2d Torts, § 449.)"

From this survey of the law we have concluded that a cause of action was stated at bench for negligent safeguard of a dangerous instrumentality and that Forest Clark's own declaration raises a triable question of fact whether his act in leaving a lethal weapon in a place accessible to his children amounted to a proper exercise of due care or whether it amounted to negligent safeguard of a deadly weapon. This issue should be resolved by a trier of fact, at least to the extent of initial presentation of evidence, and on this phase of the case we think summary judgment was improperly entered.

The summary judgment in favor of Forest Clark is reversed to the extent it purports to determine the issue of negligent safeguard of a firearm. The summary judgment in favor of Joyce Clark is affirmed.

Roth, P. J., and Herndon, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied September 8, 1971.