Lilian S. ILETO, et al., Plaintiffs,

v.

GLOCK, INC., et al., Defendants.

No. CV 01–9762 ABC (RNBx).

United States District Court,
C.D. California.

March 25, 2002.

Peter Nordberg, Esq., Berger & Montague, Philadelphia, PA, Frank Hobbs, Esq.; Geoffrey Gold, Esq., Rutter Hobbs & Davidoff, Los Angeles, CA, for Plaintiffs.

Daniel Dik, Esq.; Todd Evan Croutch, Esq., Fonda & Fraser, Los Angeles, CA, John F. Renzulli, Esq., Christopher Renzulli, Esq., Renzulli, Pisciotti & Renzulli, LLP, New York, NY, R.D. Kirwan, Esq., Robert T.N. Tafoya, Esq., Akin, Gump, Strauss, Hauer & Feld, LLP, Los Angeles, CA, for Defendants.

## ORDER RE: DEFENDANT GLOCK, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT

COLLINS, District Judge.

This case arises from two highly-publicized shooting incidents in the Los Angeles area in the summer of 1999. Plaintiffs, the victims and their family members, have brought suit against the manufacturers of the firearms the assailant, Buford O. Furrow, Jr., used and had in his possession at the time. The Motion to Dismiss of Glock, Inc. came on regularly for hearing before this Court on March 25, 2002. Upon consideration of the submissions of the parties, the case file, and the argument of counsel, the Court hereby GRANTS the Motion.

### I. PROCEDURAL HISTORY

Plaintiffs Lilian Santos Ileto, sole surviving parent of the deceased, Joseph Santos Ileto; Joshua Stepakoff, a minor through his parents, Loren Lieb and Alan B. Stepakoff; Mindy Finkelstein, a minor, by her parents, David and Donna Finkelstein; Benjamin Kadish, a minor through his parents, Eleanor and Charles Kadish; and

Nathan Powers, a minor through his parents, Gail and John Michael Powers, filed a Complaint in Los Angeles Superior Court on August 9, 2000, against Defendants Glock, Inc.; Glock GmbH; China North Industries Corp. ("China North" or "Norinco"); Davis Industries; Republic Arms, Inc.; Jimmy L. Davis; Maadi; Bushmaster Firearms; Imbel; The Loaner Pawnshop Too; David McGee; and 150 Doe Defendants. The Complaint alleged seven causes of action. The first two claims were brought by Ms. Ileto against all Defendants, for survival and wrongful death. The remaining claims were brought by all Plaintiffs against all Defendants: for public nuisance, negligence, negligent entrustment, and unfair business practices. The Complaint sought certification of a class, damages, and injunctive relief.

Defendants Loaner Pawnshop and David McGee successfully moved for dismissal for lack of personal jurisdiction. See Joint Status Report filed December 21, 2001 ("Status Report") at 3:7–8. Defendants Republic Arms, Inc. and Jimmy L. Davis answered. Id. at 3:8–9. The Superior Court, the Hon. Anthony Mohr, granted the demurrers of Defendants Glock, Inc. and Bushmaster Firearms, Inc., and dismissed all claims with leave to amend. Id. at 3:9–11.

Plaintiffs filed a First Amended Complaint ("FAC") on May 23, 2001.[1] The FAC retained Ms. Ileto's survival and wrongful death claims and all Plaintiffs' negligence and public nuisance claims and the prayer for damages. Plaintiffs did not reassert their remaining claims, including

the class claims and the claim for injunctive relief. All Defendants who had been served joined in renewed demurrers. Status Report at 3:15.

On October 17, 2001, China North was first served with the initial Complaint. See Notice of Removal ¶ 1, 11. 16–17. On November 14, 2001, China North removed the action to this Court under 28 U.S.C. § 1330 and 28 U.S.C. § 1603, on the ground that it is an instrumentality of a foreign state and, therefore, this Court has original jurisdiction. Id. at ¶ 5. On December 6, 2001, the Court determined that removal was proper and the Court has jurisdiction over the action. See Civil Minutes—General dated Dec. 6, 2001.

At a status conference on January 7, 2002, the Court declined to hear the demurrers filed in the Superior Court and ordered Defendants to file any motions to dismiss under the Federal Rules of Civil Procedure within 30 days. See Civil Minutes—General dated January 7, 2002. On February 5, 2002, Defendants Republic Arms, Inc., Jimmy L. Davis, and Davis Industries filed a Motion to Dismiss. On February 6, 2002, Defendants Quality Parts Company and Bushmaster Firearms filed a Motion to Dismiss. On February 7, 2002, Defendants China North and Glock, Inc., each filed a Motion to Dismiss.[2] The Court continued the hearing on all four motions to March 25, 2002, and set a briefing schedule. See Civil Minutes—General dated Feb. 11, 2002; Civil Minutes—General dated Feb. 13, 2002.

In this Order, the Court addresses the Motion to Dismiss of Glock, Inc.[3] Plaintiffs

---

**1.** After their dismissal, the Loaner Pawnshop Too and David McGee were not named as defendants in the FAC. See FAC ¶¶ 6–22. RSR Management Corporation and RSR Wholesale Guns Seattle, Inc. were named in place of two Doe defendants. See id. ¶¶ 15, 16.

**2.** Defendants Maadi, an Egyptian business, and Imbel, a Brazilian business, have not appeared in this Court.

**3.** It is not clear to the Court whether Defendant Glock, Inc. is affiliated with Defendant Glock GmbH. Glock GmbH has not appeared in this Court. It is also not clear whether Glock's Motion is also made on behalf of RSR Management Corporation and RSR Wholesale Guns Seattle, Inc., which are represented by Glock's counsel.

filed an Opposition on March 4, 2002. Glock filed a Reply on March 11, 2002.

## II. LEGAL STANDARDS

A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint. *See* Fed.R.Civ.P. 12(b)(6). Rule 12(b)(6) must be read in conjunction with Rule 8(a) which requires a "short and plain statement of the claim showing that the pleader is entitled to relief." 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). "The Rule 8 standard contains 'a powerful presumption against rejecting pleadings for failure to state a claim.'" *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997). A Rule 12(b)(6) dismissal is proper only where there is either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir.1988); *accord Gilligan*, 108 F.3d at 249 ("A complaint should not be dismissed 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief' ").

The Court must accept as true all material allegations in the complaint, as well as reasonable inferences to be drawn from them. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir.1998). Moreover, the complaint must be read in the light most favorable to plaintiff. *See id.* However, the Court need not accept as true any unreasonable inferences, unwarranted deductions of fact, and/or conclusory legal allegations cast in the form of factual allegations. *See, e.g., Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir.1981).

Moreover, in ruling on a 12(b)(6) motion, a court generally cannot consider material outside of the complaint (*e.g.*, those facts presented in briefs, affidavits, or discovery materials). *See Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir.1994). A court may, however, consider exhibits submitted with the complaint. *See id.* at 453–54. Also, a court may consider documents which are not physically attached to the complaint but "whose contents are alleged in [the] complaint and whose authenticity no party questions." *Id.* at 454. Further, it is proper for the court to consider matters subject to judicial notice pursuant to Federal Rule of Evidence 201. *Mir, M.D. v. Little Co. of Mary Hospital*, 844 F.2d 646, 649 (9th Cir.1988).

Plaintiffs' negligence and public nuisance claims present questions of California state law. There are no supreme court or appellate court decisions in California that have decided these particular issues. Therefore, the Court "must consider 'all available data' to anticipate how the California Supreme Court might decide the issue." *DeSoto v. Yellow Freight Sys., Inc.*, 957 F.2d 655, 658 (9th Cir.1992) (quoting *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir.1982)).

## III. FACTUAL ALLEGATIONS[4]

On August 10, 1999, Buford Furrow approached the North Valley Jewish Com-

---

4. As required for a Rule 12(b)(6) motion, the Court accepts as true all material allegations in the FAC, as well as any reasonable inferences to be drawn from them. *See Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir.1998). The Court may disregard allegations in the FAC if they are contradicted by facts established by reference to any documents attached as exhibits, or upon which it necessarily relies; the Court also need not accept as true allegations that contradict facts judicially noticed by the Court. *See, e.g., Durning v. First Boston Corp.*, 815 F.2d 1265, 1267 (9th Cir.1987); *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir.1994); *Mullis v. United States Bankruptcy Court*, 828 F.2d 1385, 1388 (9th Cir.1987). Neither of these actions would convert a motion to dismiss into a motion for summary judgment. *See, e.g., Branch v. Tunnell*, 14 F.3d at 454.

munity Center ("JCC") in Granada Hills, California. Furrow had in his possession a number of firearms: Glock's model 26, a 9mm handgun; Norinco's model 320, a 9mm rifle with an illegally shortened barrel; Maadi's model RML, a 7.62 caliber automatic rifle; Bushmaster's model XM15–E25, a .223 caliber rifle; two of Imbel's model L1A1, a .308 caliber rifle; and Davis Industries' model D–22, a .22 caliber handgun. FAC ¶ 23.

Furrow entered the JCC and shot and injured three children, one teenager, and one adult. Two of the children were Plaintiffs Joshua Stepakoff and Benjamin Kadish, who were attending summer camp at the JCC. Six-year-old Joshua was shot twice in the left lower leg and left hip, fracturing or breaking a bone. Five-year-old Benjamin was shot twice in the buttocks and left leg, fracturing his left femur, severing an artery, and causing major internal injuries. Plaintiff Mandy Finkelstein, then 16 years old and a camp counselor, was shot twice in the right leg. FAC ¶ 24. Four-year-old Nathan Powers, also a camper, witnessed the events at the JCC, which has caused him great mental suffering, anguish, and anxiety. FAC ¶ 25.

After fleeing the JCC, with the same firearms in his possession, Furrow shot and killed Joseph Ileto, an employee of the U.S. Postal Service and the son of Plaintiff Lilian Ileto, while Ileto was delivering his mail route. FAC ¶ 26.[5]

Among the evidence recovered at both crime scenes were 9mm casings. Three of the firearms in Furrow's possession used 9mm ammunition: the Norinco, the Glock, and the Davis. FAC ¶ 27.

At the time of the 1999 shootings, Furrow was prohibited under federal law from possessing, purchasing, or using any firearm, having been committed to a psychiatric hospital in 1998, placed under felony indictment in 1998, and convicted of assault in the second degree on May 21, 1999, in Washington State. FAC ¶ 28.

Defendants, who are sued individually and jointly and severally, are the manufacturers, importers, marketers, distributors, and dealers of firearms found illegally and used in the commission of crimes in Los Angeles. FAC ¶ 6. Plaintiffs have alleged that Defendants produce, market, distribute and sell substantially more firearms than they reasonably expect to be bought by law-abiding purchasers, and they knowingly participate in and facilitate the secondary market where persons who are illegal purchasers and have injurious intent obtain their firearms. FAC ¶ 31. Furthermore, Defendants select and develop distribution channels that they know regularly provide guns to criminals. FAC ¶ 32.

Defendants derive significant revenues, amounting to a substantial portion of their total firearm revenues from the crime market. They utilize the fear generated by criminal uses of their products to promote more sales to law-abiding citizens for self-protection. FAC ¶ 36.

Defendants market their guns to get into the secondary market, a market that provides a high percentage of crime guns. FAC ¶¶ 39–40. Defendants use a two-tier distribution system, selling their firearms to distributors who then sell them through dealers. FAC ¶ 41. Defendants set the terms and conditions, including distribution policies and practices, of this distribution system. Plaintiffs allege that Defendants have the power "to modify the

---

**5.** Criminal charges for the murder of Ileto and the interference with the civil rights of several of the victims were brought against Furrow in this Court on August 11, 1999, in case number CR 99–1865 NM. Furrow pled guilty to multiple counts on January 24, 2001. The Hon. Nora M. Manella sentenced Furrow to multiple life terms in prison on March 26, 2001.

policies and practices of their distributors, to seek alternative distribution channels, or to establish their own." Defendant distributors, acting as agents of manufacturers, have similar control over their relationship with dealers. FAC ¶ 42.

Crime guns are sold by "kitchen table" dealers, who may be licensed but have no store; pawn shop dealers; licensed dealers; and at gun shows. FAC ¶¶ 53–55. The National Shooting Sports Foundation, a trade association to which Glock belongs, actively promotes gun shows and has requested that its members promote them as a viable distribution channel. FAC ¶ 56.

Plaintiffs allege that "the industry as a whole," including these Defendants is fully aware of the extent of the criminal misuse of firearms. The industry is also aware that the illicit market in firearms is not simply the result of stolen guns but is due to the seepage of guns into the illicit market from thousands of unsupervised but licensed dealers. FAC ¶ 59. Defendants have actual knowledge and are specifically placed on notice of crime-prone distribution channels by the ATF. FAC ¶ 62; *see also* FAC ¶¶ 64–65. Plaintiffs allege that Defendants include incentive provisions in their contracts with dealers and distributors, but do not include provisions that would discourage sales associated with an unreasonably high risk of dispersal to prohibited persons, such as multiple sales, sales to nonstocking dealers, sales to straw purchasers, and sales at guns shows. FAC ¶ 34.

"Multiple sales" are purchases of one or more firearms by a single person at the same time or over a short period of time. A report published by the Bureau of Alcohol, Tobacco and Firearms ("ATF") states that multiple sales accounted for 22 percent of firearms first sold in 1999 and traced to crime in that same year. None of the Defendants engage in business practices designed to discourage multiple sales;

rather, their practices facilitate such sales. FAC ¶ 44.

"Straw purchases" are purchases by one person for another, who may be prohibited from purchasing by state or federal law. Such sales are illegal under federal law. At least one major firearms manufacturer provides educational training to licensed dealers of its products to sensitize them to identifying straw purchases. None of the Defendants do so. FAC ¶ 46. Plaintiffs allege that "an extraordinary proportion of crime guns bought from 'high crime' gun stores were probably straw purchased[.]" FAC ¶ 50.

Defendant manufacturers do not monitor or supervise their distributors or dealers, except in ways that are aimed at maximizing profits. FAC ¶ 71. Some Defendant manufacturers have written distribution agreements that provide for the right of termination, and occasionally they have terminated or warned distributors or dealers. However, a dangerous sales practice—such as one that would make guns easily available for potential criminal use—has not been the basis for termination and is not included in the terms of the agreements. FAC ¶ 72.

Defendant manufacturers purposely avoid any connection to or "vertical integration" with the distributors and dealers that sell their products. They offer high volume monetary incentives and generally refuse to accept returns. They contractually attempt to shift all liability and responsibility for the harm done by their products. FAC ¶ 73.

Defendant manufacturers do not use available computerized inventory and sales tracking systems that are commonly and inexpensively used throughout American industry to limit and screen customers. FAC ¶ 74. Other manufacturers of dangerous products place restrictions and limits on the distribution, distributors, and

dealers of their products to avoid known detrimental consequences. Defendant manufacturers have completely failed and refused to adopt any such limits or to engage in even minimal monitoring or supervision of their distributors and dealers. FAC ¶ 75.

Defendant manufacturers do not require that their dealers and retailers be trained or instructed: (a) to detect inappropriate purchasers; (b) to educate purchasers about the safe and proper use and storage of firearms, or to require any training or instruction; (c) to inquire about or investigate purchasers' level of knowledge or skill or purposes for buying firearms; or (d) to train purchasers who intend to carry a concealed firearm about the appropriate circumstances in which to pull it out and fire it. FAC ¶ 77.

Plaintiffs allege that Defendants design, produce, and advertise their products, such as the Glock model 26, with the illicit market as their target. FAC ¶ 35; *see also* FAC ¶ 81 ("Defendant manufacturers have increased the production of particular firearms that are popular for use by criminals."); ¶ 82 ("Defendant manufacturers have sometimes designed and advertised particular features of their products that appeal to purchasers with criminal intent."); ¶ 83 ("Defendant manufacturers design their firearms with features that are ... attractive, useful, and not detrimental for criminal use in a burglary, robbery, street murder, or drive-by shooting.").

Glock targets the police market first as a tactic to entice the civilian market, where firearms associated with use by law enforcement are in great demand and disproportionately traced to crime. FAC ¶¶ 86, 95. For instance, Glock marketed its "pocket rocket" (the models 26 and 27) as a favorite of "professionals," even though it knew that some police departments found the gun unsatisfactory and the gun should not be used by anyone other than the skilled or trained user. FAC ¶ 87. Glock designs its firearms without safety features for military and police use, then "over markets" them to civilians. FAC ¶ 88.

Glock sells police departments premature and often unnecessary firearms upgrades so that it can obtain the used guns for resale on the civilian market. Plaintiffs allege that 150,000 Glock police guns have been resold in the last five years. FAC ¶ 89. Plaintiffs allege that Glock sends some of the police trade-ins to its distributors. FAC ¶ 90. Plaintiffs allege that other police trade-ins are given back to the police officers or sold back to the officers at steep discounts and that "[a] number of officers [have] then illegally resold the guns, becoming in effect unlicensed dealers." FAC ¶¶ 93, 94.

Plaintiffs allege that the Glock pistol used by Furrow to kill Joseph Ileto was a former police gun. The gun was initially shipped to the Cosmopolis (Washington) Police Department on January 15, 1996. A week later, not satisfied with the gun, the Department decided to exchange it for another Glock model. The Department contacted a former reserve officer, Don Dineen, who maintained a gun store in Cosmopolis to perform the trade. Dineen, in turn, contacted a Glock distributor, RSR Wholesale Guns Seattle, Inc., requesting a different model. RSR Seattle shipped the new gun to Dineen, agreeing that payment did not have to be made until the original gun was sold. FAC ¶ 148. Dineen exchanged the new gun for the original gun. FAC ¶ 149.

Dineen sold the original gun to a gun collector, David Wright, at a significant discount. Wright sold the gun to another collector, Andrew Palmer. Neither Wright nor Palmer had a federal firearms license, so they did not have to run back-

ground checks on the purchasers of their guns. Dineen knew that both Wright and Palmer frequently sold and traded guns at gun shows in Spokane, Washington, a city near the home base of the Aryan Nations and the neo-nazi group to which Furrow belonged. Palmer sold the gun that had initially been sold to the Cosmopolis Police Department to Furrow at a Spokane gun show in 1998. FAC ¶ 150.

## IV. DISCUSSION

In a number of cases across the country, both city governments and individual victims of gun violence, like Plaintiffs here, have brought negligent distribution and nuisance claims against gun manufacturers and distributors. The Court's review of the resulting decisions reveals that most courts have declined to impose liability on the firearm manufacturers. *See Camden County Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 273 F.3d 536 (3rd Cir. 2001); *City of Philadelphia v. Beretta U.S.A. Corp.*, 126 F.Supp.2d, 882 (E.D.Pa. 2000), *aff'd* 277 F.3d 415 (3rd Cir.2002); *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001); *but see City of Boston v. Smith & Wesson Corp.*, No.1999–2590, 2000 WL 1473568 (Mass.Super.Ct. July 13, 2000); *Young v. Bryco Arms*, 327 Ill. App.3d 948, 262 Ill.Dec. 175, 765 N.E.2d 1 (Ill.App.Ct.2001). The Court finds these other opinions to be persuasive authority, but is at all times bound by the precedent established by California court decisions in anticipating how the California Supreme Court would decide this motion.

Glock has moved to dismiss Plaintiffs' First Amended Complaint on three grounds: first, Plaintiffs cannot maintain a negligence action; second, Plaintiffs cannot maintain a public nuisance action; and third, that the Court, in light of the Commerce Clause and Due Process Clause of the United States Constitution, should decline to exercise jurisdiction over the ac-

tion. Glock's Motion does not specifically address the first two causes of action in the FAC—Ms. Ileto's claims for survival and wrongful death—but does seek dismissal of the FAC in its entirety. Neither Plaintiffs nor Glock address whether any of the individual Plaintiffs might be differently situated with respect to the Motion than the others (*e.g.*, Plaintiff Nathan Powers was not shot).

■ This Court has a duty to avoid the adjudication of constitutional questions. *See, e.g., Spector Motor Service v. McLaughlin*, 323 U.S. 101, 105, 65 S.Ct. 152, 89 L.Ed. 101 (1944) ("If there is one doctrine more deeply rooted than any other in the process of constitutional adjudication, it is that we ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable"); *Ashwander v. TVA*, 297 U.S. 288, 347, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring) ("The Court will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of"); *Burton v. United States*, 196 U.S. 283, 295, 25 S.Ct. 243, 49 L.Ed. 482 (1905) ("It is not the habit of the court to decide questions of a constitutional nature unless absolutely necessary to a decision of the case"). Accordingly, if the Court finds that Plaintiffs cannot maintain their negligence and public nuisance claims, then the Court will not address Glock's constitutional arguments.

### A. Whether Plaintiffs Have Stated a Claim for Negligence

■ Plaintiffs allege that Glock was negligent in adopting marketing strategies that caused their firearms to be distributed and obtained by Furrow, resulting in injury and death to Plaintiffs. FAC ¶¶ 141–158. Specifically, they allege that:

the particular firearms used by Furrow in these incidents ... were marketed, distributed, imported, promoted, or sold [by Glock] in the high-risk, crime-facilitating manner and circumstances described herein, including gun shows, 'kitchen table' dealers, pawn shops, multiple sales, straw purchases, faux 'collectors,' and distributors, dealers and purchasers whose ATF crime-trace records or other information defendants knew or should have known identify them as high-risk.

FAC ¶ 156. To prevail on their negligence claim, Plaintiffs must show that Glock owed them a legal duty, that it breached that duty, and that the breach was a proximate or legal cause of their injuries. *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 477, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001) (citing *Sharon P. v. Arman, Ltd.*, 21 Cal.4th 1181, 1188, 91 Cal.Rptr.2d 35, 989 P.2d 121 (1999)). Glock contends that Plaintiffs have failed to allege facts that would support a finding that Glock owed them a duty or that Glock's breach of any such duty was a proximate cause of their injuries.

### 1. Duty

 "Fundamentally, a defendant owes a legal duty of care to persons who are foreseeably endangered by the defendant's conduct, but a defendant has no duty to control the conduct of another or to warn others endangered by another's conduct." *Jacoves v. United Merchandising Corp.*, 9 Cal.App.4th 88, 114, 11 Cal. Rptr.2d 468 (1992). The existence and scope of duty are legal questions for the Court. *Merrill*, 26 Cal.4th at 477, 110 Cal.Rptr.2d 370, 28 P.3d 116 (citing *Ann M. v. Pacific Plaza Shopping Ctr.*, 6 Cal.4th 666, 674, 25 Cal.Rptr.2d 137, 863 P.2d 207 (1993)).

 Glock first contends that the negligence claim is barred by California Civil Code § 1714.4, which provides:

(a) In a products liability action, no firearm or ammunition shall be deemed defective in design on the basis that the benefits of the product do not outweigh the risk of injury posed by its potential to cause serious injury, damage, or death when discharged.

(b) For purposes of this section:

(1) The potential of a firearm or ammunition to cause serious injury, damage, or death when discharged does not make the product defective in design.

(2) Injuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product.

Cal. Civil Code § 1714.4 (subsections c and d omitted) ("section 1714.4"). Glock relies on the decisions in *Merrill v. Navegar, Inc.*, 26 Cal.4th 465, 110 Cal.Rptr.2d 370, 28 P.3d 116 (2001), and *Casillas v. Auto-Ordnance Corp.*, No. C 95–3601 FMS, 1996 WL 276830 (N.D.Cal. May 17, 1996), both of which found that, in light of section 1714.4, gun manufacturers owed no duty to the victims of gun violence. The Court finds that both cases are distinguishable and that section 1714.4 does not by its terms bar the negligence action.

The plaintiff in *Casillas* alleged that the defendant had been negligent "in manufacturing a weapon that is disproportionately associated with criminal activity and that has no legitimate sporting or self-defense purpose[.]" 1996 WL 276830, *1. The distinction is obvious: *Casillas* involved an allegation of negligent **manufacture**, while the instant action involves a claim of negligent **distribution**. *See* FAC ¶ 156 (alleging that the firearms "were marketed, distributed, imported, promoted, or sold in [a] high-risk, crime-facilitating manner").

Plaintiffs here allege that Glock had a greater role in getting its firearms into the hands of one who would use it to do mischief than merely designing a "legal, nondefective" product. *Id.* at *2. In *Casillas*, in contrast, the claim arose from the physical design of the gun. *See id.* at *3 ("Plaintiffs claim that defendant 'should have known' that the Thompson is 'particularly well adapted to a military style assault[.]' ").

Unlike *Casillas*, *Merrill* did involve allegations of negligence in marketing and selling, as well as manufacturing, firearms. 26 Cal.4th at 473, 110 Cal.Rptr.2d 370, 28 P.3d 116. However, *Merrill* is nonetheless distinguishable from this case. The *Merrill* plaintiffs alleged that the defendant was negligent in " 'releasing the weapons for sale to the **general public** even though it knew or should have known that the **TEC–9 was particularly attractive to criminals and particularly suited for mass killings.**' " 26 Cal.4th at 474, 110 Cal.Rptr.2d 370, 28 P.3d 116 (emphasis added). That is, even the negligent sale claim was based on the **dangerous design** of the particular firearm at issue. Additionally, the *Merrill* plaintiffs claimed that the defendant was negligent in selling the firearm generally, rather than through crime-prone distribution channels.

The *Merrill* court found that section 1714.4 applied to the plaintiffs' claims because they alleged that the defendant had " '**designed** ... a weapon uniquely suited for mass killing and lacking legitimate civilian uses.' " 26 Cal.4th at 480, 110 Cal.Rptr.2d 370, 28 P.3d 116 (emphasis added). Additionally, the *Merrill* court found that the plaintiffs had brought a products liability action because "implicit in ... products

liability is that the defendant manufacturer was 'engaged in the business of distributing goods to the public.' " *Id.* at 481, 110 Cal.Rptr.2d 370, 28 P.3d 116 (quoting *Vandermark v. Ford Motor Co.,* 61 Cal.2d 256, 262, 37 Cal.Rptr. 896, 391 P.2d 168 (1964)). The Court, then, " 'view[ed]' [the] claims of negligent distribution to the general public 'as being essentially design defects in disguse[.]' " *Id.* (quoting Timothy D. Lytton, *Halberstam v. Daniel and the Uncertain Future of Negligent Marketing Claims Against Firearms Manufacturers,* 64 Brook. L.Rev. 681, 684 (1998)).

In contrast to *Merrill*, Plaintiffs here do not allege that Glock is negligent in distributing its firearms to the general public. Rather, they contend that Glock's distribution scheme specifically targets criminal users. *See* FAC ¶ 32 ("Defendant manufacturers and distributors select and develop distribution channels that they know regularly provide guns to criminals and underage users."); ¶ 156 ("Defendants' practices knowingly facilitate easy access to their deadly products by people like Furrow.").[6] Accordingly, the Court finds that the *Merrill* court's "general public" analysis does not apply to this action.

Despite the fact that *Merrill* and *Casillas* and section 1714.4 are distinguishable from this action, the rest of the analysis in *Merrill* is persuasive. Similarly, the Court must give weight to section 1714.4 as an expression of the policy concerns of the California legislature. *See Casillas,* 1996 WL 276830, *2 ("The Court believes that the California Supreme Court would not expand California law to permit liability against a manufacturer under the more narrow standards of negligence or strict

6. Many of the allegations in Plaintiffs' FAC, such as that Defendants have engaged in a "concerted effort to promote handguns to women and youth," *see* FAC ¶ 99, *see also id.* ¶¶ 100–101, are irrelevant to the claim that Defendants are negligently distributing firearms to criminal users. In viewing the FAC in the light most favorable to Plaintiffs, the Court disregards these irrelevant allegations.

liability, when California law does not permit the same action under the broader umbrella of product liability law.").[7]

Although the thrust of Plaintiffs' complaint is that Glock has been negligent in structuring and maintaining its distribution scheme, the FAC does contain specific allegations about the **design** of certain Glock guns. *See* FAC ¶ 35 ("Defendant manufacturers **design** ... their products with the illicit market as their target") (emphasis added); *id.* ¶ 81 ("Defendant manufacturers have increased the production of particular firearms that are popular for use by criminals."); *id.* ¶ 82 ("Defendant manufacturers have sometimes **designed** and advertised **particular features** of their products that appeal to purchasers with criminal intent.") (emphasis added); *id.* ¶ 83 ("Defendant manufacturers **design** their firearms with **features** that are unnecessary or detrimental for use by a law-abiding person seeking self-protection in his or her home but are attractive, useful, and not detrimental for criminal use") (emphasis added); *id.* ¶ 84 ("firearms nicknamed by the industry as 'pocket rockets,' concealable and powerful handguns, all features that are attractive to those with criminal intent"); *id.* at ¶ 88 ("Glock designs its firearms without vital safety features"); *id.* ¶ 98 ("Glock's pocket rocket has two attributes most attractive to criminals"). To the extent that Plaintiffs rely on these allegations, the negligence claim must fail under the reasoning of *Merrill* and *Casillas* and the policies expressed by section 1714.4.

The remainder of the allegations more resemble a negligent entrustment claim than a negligent manufacture claim. *See, e.g.,* FAC ¶ 61 ("Defendant manufacturers repeatedly and continually use marketing strategies and distribute their firearms through distribution channels, including specific distributors and dealers, gun shows, telemarketers, and 'kitchen table' and 'car trunk' dealers, that they know or should know regularly yield inordinate numbers and proportions of criminal end users."). The *Merrill* court suggested that negligent entrustment claims are not barred by section 1714.4. *See* 26 Cal.4th at 483–84, 110 Cal.Rptr.2d 370, 28 P.3d 116. This is not a true negligent entrustment claim, however, because there is no allegation that Glock actually and knowingly entrusted its firearms to Furrow. *See Rocca v. Steinmetz,* 61 Cal.App. 102, 109, 214 P. 257 (1923) (negligent entrustment claim arises when a supplier allows a person he knows to be incompetent or reckless to use his property).[8] Accordingly, the Court now turns to the question of whether Glock had a duty to plaintiffs to alter its distribution scheme.

California courts consider the following factors in determining if the defendant owes the plaintiff a legal duty: (1) the foreseeability of the harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered an injury; (3) the closeness of the connection between the defendant's conduct and the plaintiff's injury; (4) the moral blame attached to the defendant's conduct; (5) the policy of preventing future

---

7. The same policy is reflected in the Ninth Circuit's decision in *Moore v. R.G. Industries, Inc.,* 789 F.2d 1326 (9th Cir.1986) (relying on section 1714.4 to reject a defective design claim for a properly operating handgun).

8. Even if Plaintiffs had alleged that Glock was negligent in entrusting the Glock to the Cosmopolis Police Department, the claim would likely fail. *See Prosser & Keeton on Torts* at

201, § 33 (5th ed. 1984) ("Under all ordinary and normal circumstances, in the absence of any reason to expect the contrary, the actor may reasonably proceed upon the assumption that others will obey the criminal law."). That is, Glock would probably be entitled to assume that the police department and the other gun dealers involved would not unlawfully sell the weapon to Furrow.

harm; (6) the burden on the defendant and the consequences to the community of imposing a duty with resulting liability for breach; and (7) the availability, cost, and prevalence of insurance for the risk involved. *Merrill*, 26 Cal.4th at 477, 110 Cal.Rptr.2d 370, 28 P.3d 116 (citing *Rowland v. Christian*, 69 Cal.2d 108, 112, 70 Cal.Rptr. 97, 443 P.2d 561 (1968)). Neither party addresses these factors.

■■■■ The Court finds that the first and third factors are dispositive in this case. "The injured party must show that a defendant owed not merely a general duty to society but a specific duty to him or her[.]" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, 727 N.Y.S.2d 7, 750 N.E.2d 1055 (2001) (finding that the defendant gun manufacturer owed no duty to the relatives of individuals killed by handguns in a claim for negligent marketing). The harm to **these** Plaintiffs was not foreseeable. While it may be foreseeable that some criminals might obtain Glock firearms and use them to harm others, there was no way of foreseeing that this particular individual (Furrow) would obtain a Glock firearm and use it to injure these Plaintiffs. Additionally, Plaintiffs have not alleged that Glock had a special relationship with them or with Furrow that would have made the harm foreseeable. *See Martinez v. Pacific Bell*, 225 Cal.App.3d 1557, 1566, 275 Cal.Rptr. 878 (1990) ("The general rule of law is that no duty to control a third party's conduct exists in the absence of some special relationship creating such a duty."); *cf. Casillas*, 1996 WL 276830, *3 ("Plaintiffs present no evidence of a special relationship between Auto–Ordnance and Gomez or between Auto–Ordnance and plaintiffs.").[9]

■■■■ Even taking the allegations in the FAC as true, the connection between Glock's conduct and Plaintiffs' injury is extremely attenuated. Don Dineen, David Wright, and Andrew Palmer, the individuals who channeled the gun from Glock and its first level buyers (the Cosmopolis Police Department and RSR Seattle) to Furrow appear, from the allegations in the FAC, to have acted completely independently from Glock. *See* FAC ¶ 150. "Foreseeability cannot be based on speculation upon future actions of individual purchasers of firearms from legally licensed dealers not employed by the defendants herein." *City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F.Supp.2d 882, 900 (E.D.Pa.2000), *aff'd* 277 F.3d 415 (3rd Cir.2002). *See also Hamilton*, 96 N.Y.2d at 234, 727 N.Y.S.2d 7, 750 N.E.2d 1055 ("[T]he connection between defendants, the criminal wrongdoers and plaintiffs is remote, running through several links in a chain consisting of at least the manufacturer, the federally licensed distributor or wholesaler, and the first retailer. The chain most often includes numerous subsequent legal purchasers or even a thief."). Additionally, the immediate cause of Plaintiffs' injuries was the independent, inten-

---

9. A special relationship may exist when one supplies " 'a chattel for the use of another whom the supplier knows or has reason to know to be likely because of his youth, inexperience, or otherwise, to use it in a manner involving unreasonable risk of physical harm to himself and others whom the supplier should expect to share in or be endangered by its use ....' " *Jacoves*, 9 Cal.App.4th at 115, 11 Cal.Rptr.2d 468 (quoting *Prosser & Keeton on Torts* § 33, p. 199 (4th ed.1971)). In particular, a supplier has a duty not to provide firearms "to an individual whose use of the instrumentality the supplier knows, or has reason to know, will result in injury." *Id.* at 116, 11 Cal.Rptr.2d 468 (citing *Warner v. Santa Catalina Island Co.*, 44 Cal.2d 310, 317, 282 P.2d 12 (1955); *Talbott v. Csakany*, 199 Cal.App.3d · 700, 706, 245 Cal.Rptr. 136 (1988)). But Glock did not sell the firearm to Buford Furrow directly and had no reason to know that Furrow would ultimately receive the firearm, that he was likely to use it in a dangerous manner, or that Plaintiffs would be at risk.

tional, criminal act of Buford Furrow. *Cf.* Cal. Civil Code § 1714.4(b)(2) ("Injuries ... resulting from the discharge of a firearm ... are proximately caused by the actual discharge of the product.").

With regard to the moral blame factor, the Court observes that the neither the federal nor state legislature has imposed the duty Plaintiffs seek to impose here. This suggests a legislative judgment that Glock and the other gun manufacturers are not morally blameworthy in maintaining their current distribution systems. *Cf. City of Philadelphia,* 126 F.Supp.2d at 899 ("Indeed, public policy would seem to be opposed to a duty on gun manufacturers to police the federally licensed firearms dealers. When given the opportunity, the legislature has refused to extend liability into the area which the City proposes.").

The cases upon which Plaintiffs rely do not support the conclusion that Glock owed Plaintiffs a duty. In *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal.Rptr. 45, 507 P.2d 653 (1973), the California Supreme Court affirmed a jury verdict against the defendant for negligently overpromoting a drug that resulted in the plaintiffs' decedent's death. In *Stevens,* the decedent was a member of the relatively small group of individuals who had the illness the drug was designed to treat. Additionally, physicians like the decedent's doctor were targeted by the defendant's promotional materials. Accordingly, it was foreseeable that this physician would prescribe the drug to treat this patient. The standard the *Stevens* court applied in affirming the defendant's liability reinforces the Court's conclusion that there was a much closer connection between the defendant's conduct and the plaintiffs' injury in *Stevens* than in this case:

> One who supplies a product directly or through a third person 'for another to use is subject to liability to those whom the supplier should expect to use the [product] with the consent of the other ... for physical harm caused by the use of the [product] in the manner for which and by a person for whose use it is supplied, if the supplier ... has no reason to believe that those for whose use the [product] is supplied will realize its dangerous condition ....'

9 Cal.3d at 64, 107 Cal.Rptr. 45, 507 P.2d 653 (citation omitted) (alterations in original). In *Stevens,* the decedent used the drug with the consent of the pharmacist to whom it was supplied, the drug was used to treat the disease for which it was intended, and the defendant had no reason to believe that the decedent would be aware of the dangerous condition. In this case, in contrast, no one consented to Furrow's attack on Plaintiffs and all parties, including Furrow, were aware of the gun's dangerous properties.

Similarly, in *Ratcliff v. San Diego Baseball Club,* 27 Cal.App.2d 733, 81 P.2d 625 (1938), the plaintiff was a member of the foreseeable group of individuals who could be injured—patrons who had purchased tickets for a baseball game. *See id.* at 736, 81 P.2d 625 (finding a duty to protect those "in the area where the greatest danger exists and where such an occurrence is reasonably to be expected").[10] This group

---

10. Similarly, in *Cantwell v. Peppermill, Inc.,* 25 Cal.App.4th 1797, 31 Cal.Rptr.2d 246 (1994), the court held that owners of a bar could be held liable for the actions of those on the premises for injuries to others on the premises. *See id.* at 1803, 31 Cal.Rptr.2d 246 ("an innkeeper cannot with impunity encourage or permit its patrons to become drunk and belligerent to the point where they start assaulting other guests"). *See also Pamela L. v. Farmer,* 112 Cal.App.3d 206, 169 Cal.Rptr. 282 (1980) (finding that wife could be held liable on a negligence theory for inviting the minor plaintiffs to her home when it was reasonably foreseeable that her husband would molest them if left alone with them). Glock did not specifically invite Buford Fur-

is much smaller than the group to which Plaintiffs here belong, the general public. *Cf. Hamilton*, 96 N.Y.2d at 233–34, 727 N.Y.S.2d 7, 750 N.E.2d 1055 ("The pool of possible plaintiffs is very large—potentially, any of the thousands of victims of gun violence.").

In *Reida v. Lund*, 18 Cal.App.3d 698, 96 Cal.Rptr. 102 (1971), the California court held that the defendant parents could be liable for negligently failing to keep their military rifle out of the hands of their son, who used the rifle to shoot and kill several people on a highway. The Court did not discuss whether the injury to the deceased was foreseeable. Rather, it was informed by the policy expressed in California Civil Code § 1714.3, which makes a parent liable for injury proximately caused by the discharge of a firearm by his child. *See id.* at 705, 96 Cal.Rptr. 102. This is a very different policy than that expressed by section 1714.4, which seeks to absolve the gun manufacturers of liability. Additionally, the connection between the parents' actions in *Reida*, leaving the gun accessible, and their son's use of that gun is much closer than the connection between Glock's actions and Furrow's use of the Glock in this case.

Because of the lack of foreseeability of the injury to Plaintiffs and the attenuated connection between Glock's actions and Plaintiffs' injuries, the Court finds that Glock owed no legal duty to Plaintiffs to alter its distribution scheme. *Cf. Holmes v. J.C. Penney Co.*, 133 Cal.App.3d 216, 220, 183 Cal.Rptr. 777 (1982) ("These acts countermand against finding that Penney's has a duty to police purchasers who may be purchasing $CO_2$ cartridges to power pellet guns, absent actual knowledge that the purchaser so intends.").

### 2. Proximate Cause

 Glock also argues that even if it owed a duty to Plaintiffs, its actions were not the proximate cause of Plaintiffs' injuries. " '[T]he issue of proximate cause ordinarily presents a question of fact. However, it becomes a question of law when the facts of the case permit only one reasonable conclusion.' " *Martinez v. Pacific Bell*, 225 Cal.App.3d 1557, 1566, 275 Cal.Rptr. 878 (1990) (quoting *Capolungo v. Bondi*, 179 Cal.App.3d 346, 354, 224 Cal. Rptr. 326 (1986)). The Court agrees that the facts alleged in this case allow only one conclusion: that the "independent and intervening intentional act[s]," *id.* at 1565, 275 Cal.Rptr. 878, of Buford Furrow were the proximate cause of Plaintiffs' injuries, absolving Glock of liability under Plaintiffs' theory.

Again, the Court must keep in mind the policy expressed by section 1714.4. That section provides that, in a product liability action, "[i]njuries or damages resulting from the discharge of a firearm or ammunition are not proximately caused by its potential to cause serious injury, damage, or death, but are proximately caused by the actual discharge of the product." Cal. Civil Code § 1714.4(b)(2). Obviously, this is not a products liability action and Plaintiffs have not alleged that their injuries were caused by the firearms' dangerous properties. Nevertheless, section 1714.4 evidences an intent to hold shooters, not manufacturers, liable for gun violence.

 It is true that "an intervening act [by a third party] does not amount to a 'superseding cause' relieving the negligent defendant of liability[.]" *Landeros v. Flood*, 17 Cal.3d 399, 411, 131 Cal.Rptr. 69, 551 P.2d 389 (1976). But that intervening act must be "reasonably foreseeable." *Id.* In *Landeros*, for example, it was reason-

row to use its weapons, nor was it present when he actually used them.

ably foreseeable that if the defendant physicians sent a battered child home to the parents who had beaten her, the parents would beat her again. *See id.* Accordingly, the physicians could be held liable for her resulting injuries. In this case, however, even viewing the facts in the FAC as true, Buford Furrow's attack on these Plaintiffs was not foreseeable. It thus constitutes a superseding cause, absolving the defendant manufacturers of liability. *Cf. Gonzalez v. Derrington*, 56 Cal.2d 130, 133, 14 Cal.Rptr. 1, 363 P.2d 1 (1961) (finding defendants not liable for selling gasoline to individuals who started a fire in a bar because "the intentional misconduct of Bates and Chavez[ ] . . . constituted an independent, intervening cause" of the injuries to the patrons in the bar).

In *City of Philadelphia*, the court rejected a negligent distribution claim for lack of proximate cause. The Court finds the analysis in that case persuasive. "According to the plaintiffs' complaint, the route a gun takes from the manufacturer's control to the streets . . . is long and tortuous, passing through several hands en route . . . . Only a distant and infirm causal relationship exists between the gun industry's distribution practices and the plaintiffs' injuries." *City of Philadelphia*, 126 F.Supp.2d at 904. *Cf.* FAC ¶¶ 148–150. Additionally, "[t]he plaintiffs have not contended that the gun manufacturers **intend[ed]** to inflict injury" upon them. *Id.* (emphasis in original).[11]

Because Plaintiffs have not alleged facts that would support a finding that Glock owed them a duty or that Glock's actions were the proximate cause of their injuries, the Court finds that Plaintiffs have failed to state a claim for negligence. The negligence claim must be dismissed.

## B. Whether Plaintiffs Have Stated a Claim for Public Nuisance

Plaintiffs secondly allege that Glock's distribution scheme creates a public nuisance by unreasonably interfering with public safety and health and undermining California's gun laws. *See* FAC ¶¶ 124–125. In California, a nuisance is:

> [a]nything which is injurious to health, including but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway . . . .

Cal. Civil Code § 3479. In determining whether Plaintiffs have alleged facts that would support a finding that Glock's actions have created a public nuisance, the Court may consider:

> (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or
>
> (b) whether the conduct is proscribed by statute, ordinance or administrative regulation, or
>
> (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor

---

**11.** The Court notes that it was the City of Philadelphia, rather than the victims of gun violence, who sued the gun manufacturers in that case. The district court observed that victims would have more of an interest in pursuing a claim against the manufacturers than the city did. 126 F.Supp.2d at 905. The Court does not read the *City of Philadelphia* decision as suggesting that victims could maintain such a negligence suit, however. In fact, most of the factors that defeated the City's claim also defeat Plaintiffs' here.

knows or has reason to know, has a significant effect upon the public right. *Restatement (Second) of Torts* § 821B(2) (1977), *adopted by People ex rel. Gallo v. Acuna,* 14 Cal.4th 1090, 1104–05 n. 3, 60 Cal.Rptr.2d 277, 929 P.2d 596 (1997). Glock contends that Plaintiffs have failed to state a nuisance claim for four reasons. The Court addresses each in turn.[12]

*1. Standing*

■■■ "In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference." *Restatement (Second) of Torts* § 821C(1) (1977). Glock contends that Plaintiffs do not have standing to bring this public nuisance action because they have not suffered a harm different in kind from other members of the public.

The Restatement (Second) of Torts advises, however, that "[w]hen the public nuisance causes personal injury to the plaintiff . . . the harm is normally different in kind from that suffered by other members of the public and the tort action may be maintained." *Id.* cmt. d. Plaintiff Lilian Ileto alleges that she and her son were injured when he was shot and killed by Furrow. FAC ¶ 2. Plaintiffs Joshua Stepakoff, Mindy Finkelstein, and Benjamin Kadish allege that they were injured when

they were shot by Furrow. FAC ¶¶ 3–4. The Court finds that this physical harm to these Plaintiffs meets the requirement that they suffer harm different in kind, rather than degree, from the general public.

It is a closer question whether Plaintiff Nathan Powers, who was not shot, but has suffered "shock to his nervous system," FAC ¶ 5, has alleged a harm different in kind from the general public. Plaintiffs assert that "[t]he general public experiences danger, fear, inconvenience and interference with the use and enjoyment of public places that affect the tenor and quality of everyday life" because of the distribution of firearms to criminal users. Opp'n at 23:11–13. Plaintiffs have not alleged that Nathan Powers suffered any harm distinct from those suffered by the general public. His harm was more severe because he suffered the harm from actually witnessing a shooting. That seems to be harm different in degree, rather than kind. *See Venuto v. Owens–Corning Fiberglas Corp.,* 22 Cal.App.3d 116, 125, 99 Cal.Rptr. 350 (1971) ("[P]laintiffs are suffering a more severe irritation to [the respiratory] tract[;] such allegations merely indicate that plaintiffs and the members of the public are suffering from the same kind of ailments but that plaintiffs are suffering from them to a greater degree."). The Court need not conclusively resolve this issue, however, because Plaintiffs' public nuisance claim fails on other grounds.

---

**12.** Plaintiffs' reliance on *People v. Arcadia Machine & Tool, Inc.,* Judicial Council Coord. Proceeding No. 4095 (Cal.Super. Ct. San Diego County Sept. 19, 2000) (order overruling defendants' demurrers), is unavailing. The court's entire discussion of Plaintiffs' public nuisance claim is contained in a single sentence: "Plaintiffs have sufficiently pled conduct which could be found to be 'injurious to health, or . . . indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property . . . .' Civ.

Code § 3479." *Id.,* slip op. at 1:13–16. This Court cannot rely on such a summary conclusion in an unpublished opinion as precedent because it does not know what allegations were asserted in the plaintiffs' complaint, what arguments were made by the parties in their briefing, and what analysis was undertaken by the court. *See, e.g., United States v. Hiatt,* 527 F.2d 1048, 1051 (9th Cir.1976) (as amended) ("the two unpublished opinions on which Hiatt relies are too sketchy and unauthoritative to permit us to hold them controlling").

**1058**

## 2. Nuisance law does not apply to the lawful manufacture and sale of non-defective products

■ Glock next contends that a nuisance claim requires interference with property or an underlying tort. The Court addresses each of these arguments separately. First, the manufacture and sale of a non-defective product cannot give rise to a public nuisance claim. "Public nuisance is a matter of state law, and the role of a federal court ... is to follow the precedents of the state's highest court and predict how that court would decide the issue presented. It is not the role of a federal court to expand or narrow state law in ways not foreshadowed by state precedent." *Camden County Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 541 (3rd Cir.2001).[13] No California court, in a decision analyzing the question at any length, has addressed whether a public nuisance claim will lie in such circumstances. But the Court agrees that "if defective products cannot constitute a public nuisance, then products which function properly do not constitute a public nuisance." *City of Philadelphia*, 126 F.Supp.2d at 909 (citing *Tioga Public Sch.*

Dist. v. U.S. Gypsum Co., 984 F.2d 915, 920 (8th Cir.1993)).

■ In *City of San Diego v. U.S. Gypsum Co.*, 30 Cal.App.4th 575, 35 Cal.Rptr.2d 876 (1994), the California appellate court rejected a nuisance claim for the installation of building materials that contained asbestos. Although, "[i]n California, a broad statutory definition of nuisance appears to embrace nearly any type of interference with the enjoyment of property ...[,] no California decision ... allows recovery for a defective product under a nuisance cause of action[.]" *Id.* at 585–86, 35 Cal.Rptr.2d 876. Like the *City of Philadelphia* court, the *City of San Diego* court relied on the Eighth Circuit's decision in *Tioga Public School District. See id.* at 586, 35 Cal.Rptr.2d 876 ("Indeed, under City's theory, nuisance 'would become a monster that would devour in one gulp the entire law of tort ....' ") (quoting *Tioga Pub. Sch. Dist.*, 984 F.2d at 921).

■ "[N]uisance cases 'universally' concern the use or condition of property, not products." *Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich.App. 694, 493 N.W.2d 513, 521 (1992), *cited with approval by City of San Diego*, 30 Cal.App.4th at 586, 35 Cal.Rptr.2d 876.[14] Plaintiffs' claim,

**13.** The *Camden County* court applied New Jersey law in rejecting a public nuisance claim against firearm manufacturers. *See* 273 F.3d at 539. In *James v. Arcadia Machine & Tool*, No. ESX–L–6059–99 (N.J.Super. Ct. Essex County Dec. 10, 2001) (order granting in part and denying in part motion to dismiss), the court reached the opposite conclusion about whether the plaintiffs could state a public nuisance claim against the defendant gun manufacturers. The court observed that "New Jersey courts are not loathe to enter into new territory where a loss has been suffered." *James*, slip op. at 16. Like the Third Circuit in *Camden County*, however, this Court does not have the authority to expand California law in a way not obviously dictated by precedent.

**14.** Plaintiffs cite *Selma Pressure Treating Co., Inc. v. Osmose Wood Preserving, Inc.*, 221 Cal.App.3d 1601, 1619 n. 7, 271 Cal.Rptr. 596, for the proposition that California courts do not "categorically relieve manufacturers or suppliers of goods from liability for nuisance." This sentence is contained in a footnote in which the appellate court explains that it "need not decide whether the absence of control over the offending property insulates one who creates or assists in the creation of a nuisance ...." *Id.* Accordingly, the Court interprets the footnote to mean that manufacturers may not be immune from liability simply because their product has left their control, an issue the Court addresses, *infra* § IV.B.4. Regardless of the meaning of that footnote, however, the Court is bound by the later decisions in *City of San Diego* and

in contrast, deals solely with the distribution of a non-defective product. Guided by the decision in *City of San Diego* and in light of the policies expressed by section 1714.4 and by the California Supreme Court in *Merrill,* the Court concludes that Plaintiffs may not state a public nuisance claim for the distribution of firearms.[15]

*3. Failure to allege an underlying tort*

■ Glock next contends that Plaintiffs' nuisance claim fails because its actions that allegedly created the nuisance do not constitute an independent tort or violate a statute. The Court disagrees because no California court has ever imposed such a requirement. In fact, the opposite is true. *See, e.g., People ex rel. Gallo v. Acuna,* 14 Cal.4th 1090, 1108–09, 60 Cal.Rptr.2d 277, 929 P.2d 596 (1997) ("Acts or conduct which qualify as public nuisances are enjoinable as civil wrongs or prosecutable as criminal misdemeanors, a characteristic that derives not from their status as independent crimes, but from their inherent tendency to injure or interfere with the community's exercise and enjoyment of rights common to the public."); *Snow v. Marian Realty Co.,* 212 Cal. 622, 625–26, 299 P. 720 (1931) ("[I]t is immaterial whether the acts be considered wilful or negligent .... Nor does it make any difference whether the defendants, as they contend, exercised ordinary care in handling the engine and materials. The injury to the property itself gives rise to

the liability, irrespective of care or lack of care.").[16]

"[W]hether the conduct is proscribed by statute" is just one factor the Court may consider in determining whether the defendant's actions have given rise to a public nuisance. *See Restatement (Second) of Torts* § 821B(2)(b). Plaintiffs have alleged that the other relevant factors apply here: "[w]hether the conduct involves a significant interference with the public heath, the public safety, the public peace, [or] the public comfort" and "whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." *Id.* at § 821B(2)(a), (c). *See, e.g.,* FAC ¶¶ 126, 129, 130.

It is true that, in *People v. Lim,* 18 Cal.2d 872, 879, 118 P.2d 472 (1941), the California Supreme Court observed that "[t]he courts have thus refused to grant injunctions ... except where the objectionable activity can be brought within the terms of the statutory definition of public nuisance." The "statutory definition" to which the court referred was California Code of Civil Procedure § 3479. *See id.* at 875, 118 P.2d 472. Glock does not argue in its Motion that the proliferation of firearms, particularly among criminal users, is not "injurious to health" or does not "interfere with the comfortable enjoyment of life[.]" Cal.Code Civ. Pro. § 3479. Ac-

*Martinez,* which clearly restrict the scope of nuisance liability.

The Court also observes that although the plaintiffs in *Selma* sought to hold the defendant liable for a defective product, an unsafe waste disposal system, the nuisance that the defendant allegedly created was land-based, contamination of the water supply.

15. The Court recognizes that in *Young v. Bryco Arms,* 327 Ill.App.3d 948, 262 Ill.Dec. 175, 765 N.E.2d 1 (Ill.App.Ct.2001), the court found the *Tioga Public School District* deci-

sion inapposite. However, in light of *Merrill* and section 1714.4, the Court concludes that *City of San Diego* is more indicative of how the California Supreme Court would treat Plaintiffs' public nuisance claim.

16. The Court notes that while *Snow* supports Plaintiffs' position that an underlying tort is not required to prevail in a nuisance claim, it also suggests that some injury to property is required, as discussed by the Court in the prior section.

cordingly, the fact that Glock's actions do not constitute an independent tort or independent crime is not fatal to Plaintiffs' public nuisance claim.

### 4. Failure to allege that Glock had control over the firearm when it was discharged

Next, Glock argues that Plaintiffs have failed to allege that Glock had control over the gun when Plaintiffs were injured, a necessary element of a nuisance claim. The *City of Philadelphia* court rejected the plaintiffs' nuisance claim on this ground. *See* 126 F.Supp.2d at 910–11. The California appellate court, in *City of San Diego,* declined to decide if California nuisance law requires the defendant to own or control the means of causing the nuisance. *See* 30 Cal.App.4th at 585, 35 Cal.Rptr.2d 876. But in *Martinez,* a different California appellate court rejected a nuisance claim because the plaintiffs had not demonstrated proximate cause. *See* 225 Cal.App.3d at 1565–66, 275 Cal.Rptr. 878. The Court concludes that California courts would require a showing of control or proximate cause in this case. *Cf. Camden County,* 273 F.3d at 541 (plaintiffs must demonstrate proximate cause, control, or lack of remoteness).

In *Martinez,* the court observed that "personal injuries suffered in a robbery[ ] are totally inconsistent with [the] historical parameters of liability and damage in a nuisance claim." 225 Cal.App.3d at 1568, 275 Cal.Rptr. 878. In *Martinez,* the plaintiff sought to hold Pacific Bell liable for failing to remove a public telephone that allegedly attracted "undesirables," a number of whom shot the plaintiff during a robbery on the adjacent property. *See id.* at 1560, 275 Cal.Rptr. 878. The court analogized the public telephone to a newsstand and concluded that no claim for nuisance would lie "if a customer takes a paper out of the rack and uses it to start a fire on a nearby property, even though the

arson could not have occurred in precisely the same way if the newspaper rack had not been present . . . ." *Id.* at 1569 n. 3, 275 Cal.Rptr. 878 (citing *Gonzalez v. Derrington,* 56 Cal.2d 130, 14 Cal.Rptr. 1, 363 P.2d 1 (1961)). It is, of course, possible that Buford Furrow's attack on Plaintiffs might "not have occurred in precisely the same way" if Defendants altered their distribution schemes. But the Court concludes that California courts would not allow a nuisance claim to proceed on that basis alone. Firearms, like "[p]ublic telephones[,] can be reasonably expected to attract users from the criminal element of society. Neither public policy, nor the principles of nuisance or tort law, require the company providing public telephones [or firearms] to assume the duty of preventing such users from intentionally committing crimes . . . ." *Id.* at 1569, 275 Cal. Rptr. 878.

Plaintiffs assert that Glock may be held liable under a nuisance theory that " '[i]f the defendant voluntarily raised the storm as charged in the indictment, it is no excuse for him that he could not afterwards quell it.' " *People v. Montoya,* 28 P.2d 101, 137 Cal.App.Supp. 784, 786 (1933) (quoting *Cable v. State,* 8 Blackf. 531 (Ind.1847)). *See also Hardin v. Sin Claire,* 115 Cal. 460, 47 P. 363 (1896); *Selma Pressure Treating Co., Inc. v. Osmose Wood Preserving, Inc.,* 221 Cal. App.3d 1601, 271 Cal.Rptr. 596 (1990); *Shurpin v. Elmhirst,* 148 Cal.App.3d 94, 195 Cal.Rptr. 737 (1983) (all holding that a defendant may be liable if he participated in the creation of the nuisance). But these cases are inapposite. In all the cases cited by Plaintiffs, the nuisance arose on or in the immediate vicinity of property owned by the defendant, *see, e.g., Sunset Amusement Co. v. Bd. of Police Comm'ers of the City of Los Angeles,* 7 Cal.3d 64, 101 Cal. Rptr. 768, 496 P.2d 840 (1972) (defendant can be held liable for nuisance caused by

patrons arriving at and leaving defendant's roller skating rink), or exercised direct control over the nuisance. *See, e.g., Hardin*, 115 Cal. at 462, 47 P. 363 (defendant built and maintained obstruction blocking plaintiff's private road). In this case, Glock's actual control over its firearms ceased long before the firearms reached the street, where they allegedly become a public nuisance. *Cf. Longfellow v. County of San Luis Obispo*, 144 Cal.App.3d 379, 383–84, 192 Cal.Rptr. 580 (1983) (county could not be held liable for failure to maintain sidewalk now owned by city).

For these reasons, as well as those discussed with respect to Plaintiffs' failure to allege facts supporting a finding of proximate cause, *see supra* § IV.A.2, the Court finds that Plaintiffs have failed to allege facts that would support a finding that Glock had control over the nuisance at the time Plaintiffs were injured.

### 5. Glock's actions were lawful

Lastly, Glock argues that a nuisance claim is barred because its activities are governed by extensive federal and state regulations. This argument is not supported by California law. " '[A]lthough an activity authorized by statute cannot be a nuisance, the **manner** in which the activity is performed may constitute a nuisance.' " *Greater Westchester Homeowners Assoc. v. City of Los Angeles*, 26 Cal.3d 86, 101, 160 Cal.Rptr. 733, 603 P.2d 1329 (1979) (quoting *Venuto*, 22 Cal.App.3d at 129, 99 Cal.Rptr. 350). Accordingly, the manner in which the activity is performed must be expressly authorized by the stat-

ute in order to confer immunity on a defendant in a nuisance action. *See id.* (citing *Nestle v. City of Santa Monica*, 6 Cal.3d 920, 938 n. 16, 101 Cal.Rptr. 568, 496 P.2d 480 (1972)); *Varjabedian v. City of Madera*, 20 Cal.3d 285, 291, 142 Cal. Rptr. 429, 572 P.2d 43 (1977) ("A requirement of 'express' authorization embodied in the statute itself insures that an unequivocal legislative intent to sanction a nuisance will be effectuated . . . .").[17]

However, because California law does not support a nuisance claim for the distribution of a non-defective product and because Plaintiffs have failed to allege facts that would support a finding that Glock was in control of the nuisance at the time Plaintiffs were injured, the Court finds that Plaintiffs' public nuisance claim must be dismissed.

## V. CONCLUSION

Plaintiffs have already had an opportunity to amend their Complaint. They have not sought leave to amend again. At oral argument, counsel for Glock argued that the first two claims, for wrongful death and survival, are dependent upon the negligence and public nuisance claims. Plaintiffs have not separately opposed dismissal of these two claims. For the foregoing reasons, Glock's Motion is GRANTED. The FAC is hereby DISMISSED as to Glock in its entirety.

---

17. The Court notes that, more recently, a California appellate court found that a county defendant could not be liable in nuisance for maintaining a sidewalk in disrepair because a statute required the county to furnish all services, including street maintenance, for one year after an unincorporated area became a city. *See Longfellow*, 144 Cal.App.3d at 382–84, 192 Cal.Rptr. 580. Obviously, the statute did not expressly authorize the purported failure to maintain the sidewalk; it merely required the county to provide maintenance services. *Longfellow* may indicate that California courts are backing away from the "express authorization" requirement. But this Court is obviously still bound by the holdings of the California Supreme Court.